In the Matter of Dean **EMPORELLI**, Debtor.

**FORD MOTOR CREDIT COMPANY,** Plaintiff,

v.

Dean **EMPORELLI,** Defendant.

Bankruptcy No. 82–4024.

Adv. No. 83–445.

United States Bankruptcy Court, W.D. Pennsylvania.

Aug. 2, 1984.

Sanford M. Lampl, Pittsburgh, Pa., for defendant.

Thomas R. Wright, Pittsburgh, Pa., for plaintiff.

## MEMORANDUM OPINION

GERALD K. GIBSON, Bankruptcy Judge.

The matter presently before the Court is a Complaint to Determine Dischargeability of a Debt, filed on behalf of Ford Motor Credit Company in the individual bankruptcy proceedings of the former owner and president of Dean Ford, Inc. In its com-

plaint, Ford Motor Credit Corporation, hereinafter "FMCC" alleges that Debtor failed to remit proceeds from the sale of certain vehicles in violation of the floor plan agreement between the parties. FMCC seeks a determination of nondischargeability based upon Debtor's fraud or defalcation while acting in a fiduciary capacity; as well as Debtor's willful and malicious injury to property, pursuant to 11 U.S.C. § 523(a)(4) and (6) respectively.

Based upon the testimony adduced at trial, the Court enters the following findings of fact.

Debtor's experience in the field of car sales and management began in the year 1964 and continued throughout 1975, at which time Debtor and his attorney, Carl Volare commenced the operation of a Ford dealership located in Lodi, New Jersey, and known as Dean Ford, Inc. Debtor was responsible for the day to day operation of the business from its inception. After a one-year period of operation, Debtor purchased his partner's interest for the sum of $100,000, payable in monthly installments after the initial payment of $2,000.

On June 6, 1975 Debtor, on behalf of the dealership, executed and delivered to FMCC an agreement entitled "Automotive Wholesale Plan, Application for Wholesale Financing, and Security Agreement." The Agreement provided for the extension of credit by FMCC to Dean Ford, Inc. for the purchase of motor vehicles for resale; as well as the dealership's obligations for such financing. The agreement states in pertinent part as follows:

... Any and all proceeds of any sale, lease or other disposition of such merchandise by Dealer shall be received and held by Dealer in trust for Ford Credit and shall be fully, faithfully and promptly accounted for and remitted by Dealer to Ford Credit to the extent of Dealer's obligation to Ford Credit with respect to such merchandise.

Debtor and his spouse also executed a Continuing Guaranty of the obligations of Dean Ford, Inc. to FMCC.

At the trial on this matter, Branch Manager of FMCC, Allan Murphy testified that dealers were not required by FMCC to deposit proceeds from sale of vehicles subject to the floor plan in a special bank account. Rather, Debtor was permitted to deposit proceeds in a general account in conformity with the standard in the industry.

Murphy further testified that prior to 1979, he had little concern about the financial stability of the dealership. During the period between 1975 through mid-June, 1979, all proceeds from sale of vehicles subject to the floor plan were remitted to FMCC promptly, as indicated by February and April, 1979 audits performed by FMCC. An audit conducted on June 15, 1979 revealed only one "sale out of trust" transaction, hereinafter referred to as SOT, which was paid at the time of the audit.

FMCC Sales Representative, Jack Pribila, who had known Debtor for a period of thirteen years, testified as follows. Pribila arranged a meeting with Debtor in connection with the January, 1979 financial statement, which showed a serious decline in the financial condition of the dealership. Present at the February 26, 1979 meeting were Pribila, Debtor and Lillian Lenza, Secretary-Treasurer of Dean Ford. At that time, Pribila was informed that Debtor had invested $20,000 in the business during the preceding month. In response to Pribila's concern about the need for additional capital, Debtor assured him that additional funds were unnecessary in light of his plans to move operations to a more profitable location. Debtor further assured Pribila that no SOT transactions had ever occurred. On numerous occasions thereafter, Debtor gave similar assurances to Pribila and Murphy.

In the declining days of the dealership, Debtor borrowed the sum of $85,000 from his brother-in-law, Stanford Aronson and invested that amount in the business. With regard to additional capital, Debtor advised Murphy that his former partner, Volare was also willing to make a substantial loan.

Debtor testified that in the spring of 1979, he was experiencing serious marital difficulties. In the hopes of improving the situation, he and his family departed for Greece in late June, 1979. Debtor left Lillian Lenza in charge with instructions to continue operations as usual. Until his return to this country on July 20, 1979, Debtor had no contact with the business, nor did he leave a forwarding address or telephone number.

The deposition of Lillian Lenza, admitted into evidence as Plaintiff's Exhibit 6 reveals the following. Lenza, who had been employed in the automotive industry for ten years, was employed by Debtor from 1976 through August 1979. As office manager, she oversaw the flow of paperwork from all new and used car sales; service; rentals and leases. She prepared all financial reports, corresponding schedules and inventories. The dealership also used the services of an outside accounting firm, which reviewed the financial statements with Debtor on a monthly basis.

Lenza made deposits and disbursements daily, and furnished Debtor with the bank balance as often as three times a day. During the spring of 1979, cash flow problems became evident. At that time, Lenza began the practice of deferring all payments until Debtor could make a daily review of the bank statements. Upon several occasions, it became necessary to stagger accounts payable disbursements because of insufficient capital. Lenza provided Debtor with all checks and supporting documents and awaited his instruction as to which debts would be paid.

It was the normal practice of the dealership to close the books on the last day of the month. However, as the financial condition deteriorated, cash receipts were held open for several days in order to create the appearance of a positive cash balance on the financial statement of the previous month.

Lenza testified that shortly after Debtor's departure in late June, the July rent and loan payments became due. After payment of the loans, rent, taxes, payroll and other operating expenses, there remained insufficient funds to make the necessary remittances to FMCC in connection with the sale of vehicles subject to FMCC's floor plan. Lenza testified that all proceeds from sale of vehicles were deposited into the Dean Ford account, and there is no evidence that any of the proceeds were used for payment of expenses unrelated to the business.

Lenza testified that Debtor left no signed checks at the business premises upon his departure. Upon his return, Debtor signed a check dated July 20, 1979 made payable to "New Jersey Sales Tax" in the amount of $10,000. (Exhibit 1, Deposition of Lillian Lenza, October 7, 1983). The check was transmitted by mail and presented to the bank for payment on July 23, 1979. While Debtor testified that he first returned to the dealership on July 23, 1979, the Court is satisfied that Debtor's return to Dean Ford was sometime on or around July 20, 1979.

Upon his return to the dealership, Lenza immediately informed Debtor of the SOT transactions. In response thereto, Debtor sought immediate financial assistance from Volare and Aronson, however, his request for additional monies was refused.

Debtor testified that he was well aware of his duty to remit proceeds to FMCC in accordance with the floor plan agreement; and usually remitted proceeds within 24 hours of sale. However, upon his return, Debtor continued to sell vehicles out of trust despite knowledge of his obligation to remit necessary proceeds.

A subsequent audit revealed that the proceeds from three vehicles sold on July 19, 1979 were in the possession of the dealership upon Debtor's return to the premises, and were not deposited into the Dean Ford account until July 23, 1979.

The following events occurred upon Debtor's return. He collected his salary for the four week period of his absence. Thereafter, on July 27, 1979 he sold a Mark Lincoln to his sister for the sum of $10,000.

This vehicle was among the SOT transactions later revealed by the audit.

On July 31, 1979 Debtor met with Pribila on the business premises, although at that time the SOT transactions were not disclosed. Pribila advised Debtor that an additional investment in the amount of $106,-000 was required by August 4, 1979. Debtor then informed Pribila that the details of a loan from Volare would be finalized at a meeting scheduled for August 3, 1979. On August 3, 1979 Debtor advised Pribila that the August 3rd meeting had been postponed until August 6, 1979.

On August 6, 1979 Pribila appeared at the premises of Dean Ford, Inc. at which time Debtor disclosed that "a couple of cars" had been sold out of trust. Pribila contacted Murphy, Branch Manager of FMCC, and auditors were sent to the premises immediately. The wholesale audit which followed revealed the sale of 20 vehicles out of trust. As a result thereof, the dealership was terminated on August 6, 1979. At that time, FMCC was granted a security interest in factory receivables; shop tools; and parts valued by Debtor at $137,000.

Audits subsequently conducted by FMCC reveal the following transfers by Debtor during the period in question. On August 1, 1979, Debtor drew a bonus in the amount of $4,000. A treasurer's check from United Jersey Bank dated August 2, 1979 in the amount of $35,000 was made payable to Stanford Aronson. In addition thereto, Aronson received $15,000 by check dated August 6, 1979. Aronson had also received an additional sum of $15,000 during the months of January through July 1979. It was Debtor's testimony that during the years of 1976 through 1979, Aronson was paid $500.00 per week for services rendered to the dealership, including the purchase of used cars at various locations for resale by the Debtor.

Subsequent to termination of the dealership and liquidation of the inventory, FMCC commenced an action against Debtor and his spouse in the Superior Court of New Jersey. Included among the counts therein were damages arising from Debtor's violation of the trust agreement as well as willful and malicious conversion.

On July 13, 1982 FMCC's Motion for Summary Judgment was granted and no appeal was taken therefrom. On December 20, 1982 Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code in the Western District of Pennsylvania.

In its Complaint to Determine Dischargeability of Debt to FMCC, Plaintiff alleges that Debtor's failure to remit proceeds to FMCC in accordance with the agreement and guarantee constituted a willful and malicious conversion; as well as fraud or defalcation while acting in a fiduciary capacity.

In its Trial Memorandum, Plaintiff argues that the complaint in the New Jersey proceeding clearly placed at issue the creation of and breach by Debtor of the trust agreements; as well as the willful and malicious conversion of the proceeds from the vehicles sold out of trust. By its judgment, the Court necessarily determined these issues and the doctrine of collateral estoppel prevents Debtor from relitigating these issues.

Plaintiff further argues that when a corporate officer misuses his position to misappropriate trust property to the injury of corporate creditors, that creditor's claims are cognizable in the officer's individual bankruptcy.

In its brief, Debtor argues that the floor plan agreement between Debtor and FMCC did not create a technical trust, and therefore, § 523(a)(4) is inapplicable to except the debt owed to FMCC from discharge. Debtor further denies that he willfully and maliciously injured FMCC so as to exempt the debt owed to FMCC from discharge under § 523(a)(6). Debtor argues that FMCC was aware of and tacitly authorized the sale of automobiles without immediate payment therefor. Finally, Debtor denies that the doctrine of collateral estoppel precludes Debtor from defending FMCC's complaint.

■ The Court first addresses Plaintiff's argument that the doctrine of collateral estoppel prevents Debtor from relitigating issues anew in this proceeding. While the Supreme Court has concluded that for purposes of determining the dischargeability of a debt, the Bankruptcy Court is not confined to review of a judgment and record in a prior nonbankruptcy proceeding, it expressly left open the question of collateral estoppel. *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). The Third Circuit has held that the Bankruptcy Court may review the record of an earlier action and determine whether the doctrine of collateral estoppel precludes litigation of the dischargeability issue in the bankruptcy forum. The Third Circuit cautions that in order for collateral estoppel to serve as a bar to relitigation, the issue sought to be precluded must be the same as that involved in the prior action. *Matter of Ross* 602 F.2d 604 (3rd Cir.1979). Collateral estoppel may be invoked to bar the relitigation of subsidiary facts that were actually litigated and necessary to the decision of the nonbankruptcy court. *Matter of Shuler* 722 F.2d 1253, 10 C.B.C.2d 101 (5th Cir.1984). However, *Collier on Bankruptcy* has stated as follows with regard to a judgment based on liability falling within § 523(a)(6):

> The issue is one of dischargeability and not one of liability. While the liability may have been adjudicated, the nondischargeability of the liability has not been adjudicated. For the purpose of determining the dischargeability of the liability, the bankruptcy court should be able to base its findings on the facts relevant under § 523(a)(6) and not be bound by the findings of the state court. *3 Collier on Bankruptcy* § 523.17 at 523–133 (15th Ed.1983).

■ The Motion for Summary Judgment granted by the Superior Court of New Jersey was in part premised upon Debtor's breach of a trust agreement, as well as willful and malicious conversion. However, the complaint at bar is based upon sections 523(a)(4) and (6) of the Bankruptcy Code which provide for the nondischarge-

ability of debts arising from fraud or defalcation while acting in a fiduciary capacity; and willful and malicious injury to property. It is well-settled that these bases for nondischargeability have a specific and narrow meaning within the context of the Bankruptcy Code. Further, the objecting creditor must meet its burden of proving all elements required thereunder in order to prevail in a dischargeability action. Based upon the foregoing, the Court is satisfied that the doctrine of collateral estoppel does not act as a bar in the present action.

■ The Court now turns to the provisions of the Bankruptcy Code upon which Plaintiff's Complaint to Determine Dischargeability is based. Section 523(a)(4) excepts from discharge those debts arising from a debtor's fraud or defalcation while acting in a fiduciary capacity. Since its appearance in the Act of 1841, the term "fiduciary" has consistently been limited to a technical or express trust. 3 *Collier on Bankruptcy* 523.14 at 523–99 (15th Ed. 1983). Moreover, it is well-settled that the mere presence of language in an agreement purporting to create a trust is not determinative for purposes of nondischargeability. *Davis v. Aetna Acceptance Corp.* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re Lowther* 32 B.R. 638 (Bkrtcy.W.D.Okla.1983); *Matter of Storms* 28 B.R. 761 (Bkrtcy.E.D.N.Carol.1983).

The case of *In re Clifton* presents a factual situation similar to that at bar. Therein, FMCC commenced an action against debtor to determine dischargeability of a debt arising from an automobile dealership's sale of vehicles out of trust. The Bankruptcy Court for the District of New Mexico states as follows:

> In the automotive wholesale plan … the word "trust" appears once, in reference to the manner in which funds were to be held after retail sales of vehicles. *Davis* clearly prohibits the imposition of a fiduciary duty upon that single use of the word "trust" particularly in the absence of evidence of true ownership of the vehi-

cle or funds by FMCC. *In re Clifton*, 32 B.R. 666, 668 (Bkrtcy.D.New Mex.1983).

■ Based upon the foregoing, the Court is satisfied that the agreement of the parties herein did not constitute a technical or express trust within the meaning of § 523(a)(4),

The Court next examines § 523(a)(6) which excepts from discharge debts arising from willful and malicious injury by the debtor to another entity or to the property of another entity. The legislative history of § 523(a)(6) defines "willful" as "deliberate and intentional". H.R. No. 95–595, 95th Cong., 1st Sess. (1977) 363; S.R. No. 95–989, 95th Cong., 2nd Sess. (1978) 77–79; U.S.Code Cong. & Admin.News (1978) p. 5787. For purposes of § 523(a)(6), "malicious" has been defined as "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will"; *In re Meyer*, 7 B.R. 932, 3 C.B.C.2d 534 (Bkrtcy.N.D.Ill.1981); and as the intentional disregard for the rights of another. *Matter of Langer*, 12 B.R. 957, 7 B.C.D. 1323 (D.N.Dakota, 1981).

■ It is well settled that the intentional conversion of another's property without justification or excuse is a willful and malicious injury within the meaning of § 523(a)(6). 3 *Collier on Bankruptcy* 523.-16 at 523–120. The finding of ill-will or personal malice is unnecessary to support a determination of willful and malicious conversion. *In re Obermeyer* 12 B.R. 27 (Bkrtcy.N.D.Ohio 1981); *In re Lewis* 31 B.R. 83 (Bkrtcy.W.D.Okla.1983).

■ It is also beyond dispute that the sale of collateral by a debtor without payment to the secured creditor therefor can constitute willful and malicious injury to property. *In re Clifton*, supra; *In re Graham* 7 B.R. 5, 6 B.C.D. 539, 2 C.B.C.2d 695 (Bkrtcy.D.Nev.1980); *In re Donofrio*, 19 B.R. 734 (Bkrtcy.N.D.Ohio 1982); even if proceeds are used solely for the operating expenses of the company. *In re Scotella* 18 B.R. 975 (Bkrtcy.N.D.Ill.1982).

*Matter of Klix* 23 B.R. 187, 7 C.B.C.2d 276 (Bkrtcy.E.D.Mich.1982) presents a factual situation similar to that at bar. Therein, Debtor was the owner of a Ford dealership and had vast experience in the field of automobile sales. In holding that Debtor's failure to remit proceeds from the sale of vehicles subject to FMCC's floor plan agreement constituted willful and malicious injury within the meaning of § 523(a)(6), the Court states as follows:

> ... it would be difficult to find that (debtor) possessed a purposeful intent to harm FMCC. However, he knew that his act of conversion was in contravention of the rights of Ford Credit and he proceeded deliberately and intentionally in face of that knowledge.

■ Having examined the pertinent case law, the Court now returns to the facts in the dispute at bar. Plaintiff's Exhibit 7 is a summary of all SOT transactions prepared from the records of Dean Ford, Inc. Set forth therein are all SOT transactions during the months of July and August, 1979; including the identity of the purchaser, date of payment, floor plan amount, and accumulated interest and flat charges.

With regard to those vehicles which were sold out of trust by Debtor himself upon his return from Greece, the record amply supports a determination that Debtor's actions constitute willful and malicious injury within the meaning of § 523(a)(6).

With regard to the three July 19, 1979 SOT transactions which occurred immediately prior to Debtor's return to the United States, the Court has previously found that the actual proceeds therefrom remained on the premises of the dealership until July 23, 1979. According to Debtor's own testimony, he was present at the dealership on that date. Therefore, the Court is satisfied that Debtor's actions with regard to the proceeds from the three July 19 SOT transactions constitute willful and malicious injury within the meaning of § 523(a)(6) and are therefore nondischargeable.

Finally, the Court addresses the dischargeability of the five vehicles sold out of trust during the period of July 5, 1979 through July 18, 1979, inclusive. While the

Court is cognizant that the aforementioned sales occurred during Debtor's absence, it is firmly convinced that given the financial condition of the dealership at the time of his departure in late June, 1979, Debtor had full knowledge that the SOT transactions were inevitable and imminent. Further, upon his return to the dealership, Debtor made no attempt to notify FMCC of the sales out of trust, but rather concealed them until it was no longer possible. The Court is satisfied that Debtor had knowledge of the SOT transactions which occurred during the July 5–18 period; acquiesced thereto, and ratified Lenza's actions upon his return.

In a recent decision, the Eighth Circuit Court of Appeals has stated as follows in connection with a complaint to determine dischargeability based upon obtaining money by fraud:

> ... more than the mere existence of an agent-principal relationship is required to charge the agent's fraud to the principal. However, as indicated, actual participation in the fraud by the principal is not always required. If the principal either knew or should have known of the agent's fraud, the agent's fraud will be imputed to the debtor-principal. When the principal is recklessly indifferent to his agent's acts, it can be inferred that the principal should have known of the fraud. *Matter of Walker*, 726 F.2d 452, 10 C.B.C.2d 195, 196 (8th Cir.1984).

Although the action at bar is based upon willful and malicious injury rather than fraud, the Court adopts the reasoning set forth therein. Based upon the foregoing, the Court concludes that the floor plan amounts for the five vehicles sold out of trust during the period of July 5 through July 18, 1979 are nondischargeable.

In conclusion, the amount of $129,479 representing the floor plan amounts for vehicles sold out of trust during the period of July 5, 1979 through August 6, 1979 as set forth in Plaintiff's Exhibit 7 is nondischargeable. While Plaintiff also seeks a determination of nondischargeability for accumulated interest and flat charges, the

Court can find no basis for such a determination.

An appropriate order will be entered.