In re Marvin L. NUCKOLS, Debtor.

Sylvia F. NUCKOLS, Plaintiff,

v.

Marvin L. NUCKOLS, Defendant.

Bankruptcy No. 84–00638–R.
Adv. No. 84–0245–R.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

March 18, 1985.

C. Thomas Ebel, Richmond, Va., for plaintiff.

Raymond J. Sinnott, Chesterfield, Va., for defendant.

MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter came before the Court on the complaint of Sylvia F. Nuckols to determine the dischargeability of a certain debt owed to the plaintiff by the defendant, Marvin L. Nuckols. A trial was held in this matter on February 14, 1985 at which time the Court heard the evidence of the parties and the argument of counsel. At the conclusion of the trial, the Court took the matter under advisement and ordered the filing of briefs. After consideration of the evidence and argument of counsel and the briefs submitted herein, this Court makes

the following findings of fact and conclusions of law.

## FINDINGS OF FACT

The plaintiff seeks in this adversary proceeding to have this Court declare nondischargeable a certain debt owed by the defendant to the plaintiff in the amount of $40,000 plus interest at 12 percent per annum from March 20, 1984 until paid. This debt arose as a consequence of judgment being entered against the defendant in a civil suit in Virginia state court awarding $40,000 in damages for injuries to the plaintiff by the defendant's assault and battery. The assault and battery was alleged to have taken place on May 10, 1982. Although the issue of punitive damages was also submitted to the jury in the state court proceeding, the jury returned a verdict in favor of the defendant on this issue.

In addition to the civil judgment against the defendant, a criminal prosecution was also instituted by the Commonwealth of Virginia against the defendant for the statutory felony of malicious bodily injury. Va.Code § 18.2–51 (Repl.Vol.1975). Pursuant to a plea bargain agreement, the charge was reduced to assault and battery, a misdemeanor, to which the defendant pled guilty. The court's order dated September 21, 1982 gave the defendant a six month suspended sentence on condition that the defendant continue to receive marriage counseling with his wife until such time as terminated by the marriage counselor.

At the conclusion of the civil suit in Virginia state court on March 20, 1984, the defendant was indebted to the plaintiff in the amount of $40,000 plus interest at 12 percent per annum until paid. Thereafter, on May 3, 1984, the defendant filed his voluntary Chapter 7 petition in bankruptcy listing this debt on his schedules as an unsecured claim. This adversary proceeding to determine the dischargeability of this debt was initiated on July 17, 1984.

At the trial held on February 14, 1985 the Court heard the live testimony of Marvin L. Nuckols, Sylvia F. Nuckols, and Karena Porter, the 15 year-old daughter of Sylvia Nuckols by a previous marriage. By consent of the parties the deposition testimony of Dr. Richard B. Caspari, Mrs. Nuckols' treating physician, was read into the record. Dr. Caspari is a physician licensed to practice in Virginia and is board certified in orthopedic medicine and surgery.

The evidence revealed that on May 10, 1982, the plaintiff and the defendant were married and living together in the same household. Karena Porter lived with them, as did a granddaughter and at least one other family member. The home was a somewhat modified tri-level, with an additional fourth level bedroom at the top of four or five short stairs. When standing on the third level at the foot of the steps, a person looking up the stairs has a visual field of nearly the entire bedroom including the bed.

On the night of May 10, 1982, Mrs. Nuckols' leg was broken. She was taken to the emergency room of a nearby hospital and treated by Dr. Caspari. Dr. Caspari testified in his deposition that both the tibia and fibula bones in the left leg below the knee were fractured. In his opinion, the plaintiff had suffered "spiral" or "rotational" fractures in these two bones.

The testimony was conflicting as to some of the events which transpired on the day in question, May 10, 1982 which resulted in the injury to the plaintiff. There was a dispute as to the hour in which the defendant arrived home from work on the afternoon of May 10, 1982, as well as how many mixed drinks of bourbon and gingerale were consumed by the defendant, and whether or not the plaintiff called the defendant to dinner with the rest of the family. The Court finds these collateral issues to be immaterial to the resolution of this case. The undisputed facts are that the defendant arrived home on the afternoon of May 10, 1982, worked in the yard for approximately an hour or an hour and a half, returned inside to the lower level den to watch television in the early evening and did not eat dinner.

At approximately 9:00 p.m. on May 10, 1982 the defendant walked upstairs from the den to the bedroom on the fourth level where the plaintiff was lying on the bed with her granddaughter watching television. The defendant entered the room to speak to the granddaughter. At this point, the testimony is conflicting. The plaintiff contends that the defendant wanted to take the granddaughter down to the den to watch television with him and she refused to let him have the child. This precipitated an argument which resulted in the defendant taking his fist and hitting the plaintiff on her arms and legs. She held up her arms to shield against the blows at which point the defendant grabbed her right leg and pulled her off the bed. Upon resuming her position on the bed, the plaintiff testified that the defendant again grabbed her right leg and pulled her from the bed with such force that she was airborne and flung some unspecified number of feet before landing and finding her left leg broken.

The defendant's memory of the events on May 10, 1982 do not coincide. The defendant contends that he entered the bedroom to talk with the granddaughter and watch television and that the plaintiff began arguing and cursing at the defendant. The defendant testified that this verbal abuse went on for fifteen or twenty minutes at which time the plaintiff slid down the bed and kicked the defendant in the groin. The defendant testified that at no time did he ever hit the plaintiff on the arms and legs with his fist. The defendant testified that his reaction was to protect himself and hence he grabbed the plaintiff's right leg and pulled her off the bed such that her left leg came down on the edge of a flower pot and was broken. He testified that he administered first aid to the injured limb.

However, neither Karena Porter's testimony nor Dr. Caspari's deposition testimony support the defendant's assertion of the facts. Karena Porter testified that she had been awakened by an argument upstairs and had gotten up and come to the foot of the stairs leading up to the fourth level. There she observed the defendant striking the plaintiff with his fist on her arms and legs. Miss Porter then testified that she attempted to use the telephone in the house to call the police but found the phone not to be in working order. She then proceeded to the next door neighbor's house to call the police. She was successful in reaching the police at that time. Although Miss Porter witnessed the events leading up to the injury complained of herein, she apparently did not remain at the foot of the stairs long enough to see the actual injury occur. Although Miss Porter admitted that she had rehearsed her testimony once with the plaintiff and once with plaintiff's counsel, the Court has no reason to doubt the veracity of Miss Porter's testimony.

Moreover, Dr. Caspari's deposition testimony indicated that the plaintiff's injuries were of a "rotational" or "spiral" nature which may have been caused by the plaintiff having caught her right foot in the bedpost or the bedspread if pulled from the bed in the manner in which she testified. Dr. Caspari testified that bone is weakest in rotation and that it takes less force to break a bone if it is rotated than it does by the application of direct force. He further testified that "[t]he fracture is what we call a spiral fracture. It starts a little higher than it ends and in essence this is a rotational injury. It's not as though the bone were directly bent and then broken...." (Transcript of the Deposition of Dr. Caspari, at p. 5.) The Court thus finds that the plaintiff's testimony is more consistent with the type of fractures she suffered in the tibia and fibula of her lower left leg than is the testimony of the defendant that the fracture was caused by a direct blow as a result of the left leg landing on the edge of a flower pot.

The Court concludes that the testimony of Karena Porter, Dr. Caspari, and the plaintiff are substantially consistent and credible as to the events which actually occurred on May 10, 1982. Although the Court has not resolved every issue of fact raised by the parties, it is not necessary for the Court to do so. Many of these collateral fact disputes are immaterial to the basic issue or trivial in nature. The undisputed

facts are that the defendant entered the bedroom on the fourth level of the home, an argument ensued, the defendant grasped the plaintiff by her right leg pulling her with sufficient force to cause her to become airborne and fly out of the bed and to land on the floor with a broken left leg diagnosed as a spiral fracture of her tibia and fibula. The expert testimony of Dr. Caspari indicates that these facts are consistent with the rotational nature of the fractures. These are the operative facts upon which this Court must determine whether or not this debt is to be determined nondischargeable in bankruptcy.

## CONCLUSIONS OF LAW

The plaintiff seeks to have this debt declared nondischargeable pursuant to 11 U.S.C. § 523(a)(6).[1] In so doing, the plaintiff asks this Court to reconsider its decision in *In re White*, 18 B.R. 246 (Bankr.E.D.Va.1982) which held that the "reckless disregard" standard of *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904) was no longer sufficient to make a debt nondischargeable pursuant to 11 U.S.C. § 523(a)(6). However, for the reasons which follow, this Court finds that its decision in *White* should be upheld and is dispositive of the issue at bar.

The first issue which this Court feels compelled to address is the plaintiff's request that this Court reconsider its decision in *White* which held that the term "willful" within the meaning of § 523(a)(6) did not include a finding of "reckless disregard" which had been imported into the language of the Bankruptcy Act of 1898, as amended, by *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904). As stated in *White*, the legislative history annexed to the newly enacted Code of 1978 indicated that Congress intended to eliminate the *Tinker* "reckless disregard" standard and restrict the term "willful" to a meaning of deliberate or intentional. *White*, 18 B.R. at 248 n. 2. The plaintiff

asks this Court to find that if the defendant's actions were not intentional and deliberate, they were nevertheless the result of allegations of excessive alcoholic consumption which would constitute reckless disregard for the safety of the plaintiff and entitle the plaintiff to a judgment in this Court for nondischargeability.

In asking this Court to overrule *White* the plaintiff cites *In re Auvenshine*, 9 B.R. 772 (Bankr.W.D.Mich.1981). The Court, however, does not find the *Auvenshine* decision persuasive inasmuch as the court accorded little or no weight to the legislative history of § 523(a)(6), and held that the reckless disregard standard was still applicable in cases of this type. The *Auvenshine* opinion also failed to address why Congress, had it not intended to restrict the meaning of the term "willful," would have allowed publication of such explicit language in the House and Senate Reports overruling *Tinker* if it did not intend such a result. The meaning of the terms "wilful and malicious" as used in § 523(a)(6) is sufficiently ambiguous that reference to the pertinent legislative history is entirely proper to discern Congressional intent in this regard. There may be other reasons why Congress chose to leave the actual language of § 523(a)(6) intact and chose to overrule *Tinker* through legislative history. This Court does not believe it should ignore such a clear expression of intent by Congress. *See In re White*, 18 B.R. 246 (Bankr.E.D.Va.1982); *In re Bryson*, 3 B.R. 593 (Bankr.N.D.Ill.1980). Accordingly, this Court declines to import into the language of § 523(a)(6) the standard of reckless disregard which would be the equivalent of willfulness in determining the nondischargeability of any debt.

Hence, three elements must be proved to establish nondischargeability pursuant to § 523(a)(6). First, plaintiff must prove a willful and malicious injury. In this regard, the term "willful" means deliberate or intentional. *See In re White*, 18 B.R.

---

1. 11 U.S.C. § 523(a)(6). A discharge under § 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

246, 248 n. 2 (Bankr.E.D.Va.1982) (citing H.R.Rep. 95–595, 95th Cong., 1st Sess., 365 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6320–21). This Court in *White* also held that the term "malicious" meant an injury that "was wrongful and without just cause or [excuse] even in the absence of personal hatred, spite or ill will." *Id.* at 248. Second, the injury must be caused by the debtor, and finally the injury must be to another entity or to the property of another entity. 11 U.S.C. § 523(a)(6).

 Applying the facts to the law in this case, the Court finds that the defendant's grasping of the plaintiff's right leg and pulling her off the bed with sufficient force to make her airborne was an intentional and deliberate act constituting willfulness within the meaning of the Bankruptcy Code. Whether or not the defendant intended to injure the plaintiff is not the question. It is the intent to do the act which is the operative legal event and not the intent to do harm. Moreover, the Court finds the defendant's acts to have been malicious in that they were wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill will. Even if the defendant's actions were in response to having been kicked, the Court finds the defendant's actions to have been excessive. It is possible that an even more serious injury could have occurred to the plaintiff from such actions. Although not necessary to a finding of maliciousness, the Court notes that the parties have been having marital problems prior to the occurrence of these events and that there existed a degree of animosity and even enmity between the parties.

With respect to the second and third elements, the Court finds by the defendant's own admission that the injury was caused by the debtor and was an injury to another entity within the meaning of the Bankruptcy Code. The term "entity" is defined in § 101(14) to include a natural person.

In summary, the defendant intentionally, deliberately, and wrongfully caused injury to the plaintiff by grasping her right leg while she lay on the bed and pulling her with sufficient force to cause her to become airborne and in some manner break her left leg causing serious injury. The Court concludes that this is the type of debt which should be determined to be nondischargeable in bankruptcy under 11 U.S.C. § 523(a)(6) and accordingly the Court finds that the defendant's obligation to the plaintiff arising out of the state court judgment is nondischargeable.

An appropriate Order will issue.