In re Clarence B. TESTER, Betty C. Tester, Debtors.

**AMERICAN HONDA FINANCE CORPORATION, Plaintiff,**

v.

**Clarence TESTER, et ux., Defendants.**

**Bankruptcy No. 7–85–00029–R.**

**No. 7–85–0074.**

United States Bankruptcy Court, W.D. Virginia, Roanoke Division.

June 23, 1986.

488

Parvin & Wilson, Roanoke, Va., for debtor/defendants.

Strickland & Rogers, Roanoke, Va., for plaintiff.

A. Carter Magee, Jr., Roanoke, Va., Trustee.

## MEMORANDUM OPINION

H. CLYDE PEARSON, Bankruptcy Judge.

The issue before the Court is whether the amount owing to American Honda Finance Corporation for unpaid floor-plan inventory shall be held nondischargeable pursuant to 11 U.S.C. § 523(a)(4) and (a)(6).

Upon hearing, the facts appeared as follows. The Plaintiff, American Honda Finance Corporation ("AHFC"), is a California corporation engaged in the floor-plan financing of Honda motorcycles and parts to authorized dealers. The Debtor, Clarence B. Tester, and two partners formed the corporation Valley Cycle Sales in 1976 for sale of motorcycles and parts. Since 1981 or 1982 when the two partners gave up their interests to Debtor, the Debtor has served as president. Valley Cycle Sales operated two stores—one in Roanoke, Virginia and a store in Christiansburg, Virginia, opened in 1979. The transactions relevant to this adversary proceeding arose from operation of the Christiansburg store which was managed by the Debtor's son, Wesley Tester.

On July 11, 1984, the Debtor, in his capacity as president of Valley Cycles Sales, entered into a security agreement with AHFC to provide floor-planning of inventory. The agreement was an update of an identical agreement which had been executed in 1980 when Tester was in business with his partners. The nine-page security agreement granted AHFC a continuing security interest in all collateral, including proceeds and accounts receivable. The agreement further provided in relevant part:

"... 4.2. In any event, not later than upon the Sale of any item of Inventory, Dealer will pay to Secured Party the amount of Dealer's obligation allocable to that item of Inventory ...

5.1. Upon any Sale of Inventory, Dealer will hold the Proceeds in trust for Secured Party to the full extent of Dealer's Obligation(s) ...

8.8 In order to protect Secured Party's security, Dealer will, *upon the request of Secured Party*, place and maintain in a separate bank account such sum of money as Secured Party may specify." (emphasis added)

Shortly after execution of the security agreement, the Debtor also executed a personal guaranty statement in which he personally guaranteed performance of the obligations of Valley Cycle Sales to AHFC.

At the time relevant to these proceedings, Valley Cycle Sales had several general bank accounts at different banks upon which checks were drawn for operation of the business. Proceeds from sale of motorcycle units were not placed in a special account, nor was such an account ever discussed by the parties or requested orally or in writing by AHFC pursuant to the security agreement.

To ensure compliance with terms of the security agreement, AHFC employed floor-plan checkers to visit dealerships and conduct monthly audits. Testimony indicated that it was the common practice and procedure between the parties that at times, checks for units sold would be given to floor-plan checkers during their visits to forward to AHFC and, hence, were not immediately remitted. Some checks were mailed directly to AHFC by Valley Cycle Sales.

In 1984, Valley Cycle Sales began experiencing financial difficulty and cash flow problems. In March, 1984, it closed its operation in Roanoke. On August 24, 1984, a routine floor-plan audit was conducted at the Christiansburg store. Several days later, the report arrived at the New Jersey office of John C. Marr, Field Representative for AHFC. Entries on the report indicated that proceeds in the approximate sum of $28,000.00 from sale of eight (8) motorcycles by Valley Cycle Sales during August, 1984 had not been forwarded to AHFC. AHFC contacted Wesley Tester regarding the units and was told that checks were in the mail. The evidence reflects that two checks dated September 11, 1984 and September 12, 1984 totaling $13,906.40 were made out to AHFC but not deposited.

On September 11, 1984, the Debtor received a call from AHFC concerning the unpaid units. Debtor, who left the day-to-day operation of the business to his son and visited the Christiansburg store on an infrequent basis, testified that this was his first knowledge of any problem in remittance of proceeds. Thereafter, the Debtor contacted his son, who told him that all proceeds had been placed in the general business account and that the account had been used for payment of general business expenses, including the business payroll.

After consulting with William G. Belknap, Assistant Corporate Manager in charge of documentation for AHFC, Marr traveled to Christiansburg on September 13, 1984 to investigate the discrepancies and conduct his own audit. At that time, Wesley Tester told Marr that Valley Cycle Sales was attempting to switch its financing to another company and that approximately $10,000.00 was on hand to pay for unpaid units. Thereafter, the Debtor arrived and stated that he was unable to obtain alternative financing.

On September 14, 1984, the Debtor gave Marr a Certified check in the amount of $10,598.00 to cover payment on four (4) units to be titled. The Debtor testified that it was mutually advantageous to AHFC and Valley Cycle Sales to pay for and title these units to ensure that no problems with their sale would develop. Marr applied the amount to the units in accordance with this understanding.

On the same date, Marr prepared a handwritten agreement which acknowledged the remaining amount due AHFC for unpaid

units of $17,920.40, to be paid in two monthly installments of $5,970.00 on October 14 and November 14 and one payment of $5,980.40 by December 14, 1980. The Debtor testified that it was his understanding at the time of signing the document that he was not going to be held to a strict repayment schedule, but merely given a period of 90 days within which he could obtain the necessary funds to repay the obligation. In support thereof, Tester testified that he requested that the word "agreement" in the first line of the document be changed to "letter of intent".

Almost immediately following execution of the document, AHFC repossessed all remaining floor-plan units, virtually closing the business. The units, all in good condition, were subsequently sold to American Honda Motor Company which paid the full amount outstanding on the units. Thereafter, the amount owed AHFC was reduced by a credit of balances due to Valley Cycle Sales from American Honda Motor Company for sale of parts. The total amount outstanding in controversy in this case is $13,490.40.

Valley Cycle Sales filed its Chapter 7 petition with this Court on December 31, 1984. On January 8, 1985, the Debtor and his wife filed their individual Chapter 7 petition. On April 4, 1985, AHFC filed a Complaint initiating this adversary proceeding alleging nondischargeability pursuant to 11 U.S.C. § 523(a)(4), which was thereafter amended to allege nondischargeability pursuant to § 523(a)(6). By Order of this Court previously entered, Mrs. Tester has been dismissed as a party-defendant from this adversary proceeding.

At the close of Plaintiff's evidence, the Debtor moved for summary judgment. Ruling on the motion was withheld pending presentation of the Debtor's case, at which time all matters were taken under advisement for determination.

Briefly stated, counsel for AHFC contends that the unpaid balance due AHFC should be held nondischargeable pursuant to § 523(a)(4) in that the terms of the security agreement establish a trust relationship with respect to the sale proceeds or, alternatively, that acts of the Debtor amounted to embezzlement. Further, counsel contends that the amount due AHFC should be found nondischargeable under § 523(a)(6) in that failure to remit the proceeds amounted to a willful and malicious injury to property.

■ 11 U.S.C. § 523 outlines the exceptions to discharge in Bankruptcy proceedings. Exceptions to discharge are to be strictly construed against the objecting creditor and liberally in favor of the debtor. 3 *Collier on Bankruptcy*, § 523.05A at 523–15 (15th Ed.1985). *See also Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1914); *Roberts v. Ford*, 169 F.2d 151 (4th Cir.1948); *Royal Indemnity Co. v. Cooper*, 26 F.2d 585 (4th Cir.1928).

The rationale for this strict construction is "to give debtors a new opportunity in life and a clear field for future effort, unhampered by the pressure of preexisting debt." *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); *Lines v. Frederick*, 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970); *Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934); *Lewis v. Roberts*, 267 U.S. 467, 45 S.Ct. 357, 69 L.Ed. 739 (1925); *Williams v. United States Fidelity & Guaranty Co.*, 236 U.S. 549, 35 S.Ct. 289, 59 L.Ed. 713 (1915).

Section 523(a)(4) provides that "a discharge under Section 727, 1141, or 1328(b) of this Title does not discharge an individual debtor from any debt—... (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

To except a debt from discharge under § 523(a)(4) on the basis of fraud as claimed in this case by AHFC, the activity of the debtor evincing that fraud must have occurred while acting in a "fiduciary capacity". The Bankruptcy Courts have developed a narrow interpretation of what constitutes a fiduciary relationship under § 523(a)(4). *In re Myers*, 52 B.R. 901, 904 (Bankr.E.D.Va.1985); *In re Criswell*, 52 B.R. 184 (Bankr.E.D.Va.1985). The term "fiduciary capacity" has consistently been

limited in its application to apply only to what may be described as technical or express trusts, and not to trusts *ex maleficio* that may be imposed because of the very act of wrongdoing out of which the contested debt arose. *In re Fussell,* 15 B.R. 1016, 1019 (W.D.Va.1981); 3 *Collier on Bankruptcy,* § 523.14 at 523–93. *See also Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). In doing so, the courts have attempted to avoid making the exception so broad that it reaches such ordinary commercial relationships as creditor-debtor and principal-agent. *In re Miles,* 5 B.R. 458, 459 (Bankr.E.D.Va.1980).

Counsel for AHFC contends that Tester was in a fiduciary relationship under the terms of Paragraph 5.1 of the Security Agreement which states that "upon sale of the inventory, Dealer will hold the proceeds *in trust*" for AHFC. However, courts have recognized that the fact that a commercial agreement contains the word "trust" does not make the agreement a trust agreement, nor does it create a fiduciary relationship. *In re Gallaudet,* 46 B.R. 918 (Bankr.D.Vt.1985), citing *Lord's, Inc. v. Malley,* 356 F.2d 456, 458 (7th Cir.1965), *cert. denied* 385 U.S. 847, 87 S.Ct. 55, 17 L.Ed.2d 78 (1966); *In re Falk of Bethlehem,* 3 B.R. 266, 270 (Bankr.D.N.J.1980); *In re Paley,* 8 B.R. 466 (Bankr.E.D.N.Y. 1981). *See also Matter of Emporelli,* 42 B.R. 814, 819 (Bankr.W.D.Pa.1984); *In re Martin,* 35 B.R. 982, 985 (Bankr.E.D.Pa. 1984); *In re Lowther,* 32 B.R. 638 (Bankr. W.D.Ok.1983); *In re Clifton,* 32 B.R. 666, 668 (Bankr.D.N.M.1983).

■ As the Supreme Court recognized in *Davis, supra,* in concluding that documents creating a floor-plan financing arrangement did not create an express trust or fiduciary relationship, "the resulting obligation is not turned into one arising from a trust because the parties to one of the documents has chosen to speak of it as a trust." 293 U.S. at 334; 55 S.Ct. at 154. It is the character of the debt relationship and not its form that determines whether a fiduciary "trust" relationship exists. *In re*

*Barwick,* 24 B.R. 703, 705 (Bankr.E.D.Va. 1982), citing *In re Paley, supra,* at 469.

■ The word "trust" appears once in the agreement totalling nine typed pages in length. The agreement is labeled a Security Agreement and speaks in terms of AHFC as a secured party. The agreement explicitly details the duties of the Dealer and gives AHFC a broad spectrum of rights and remedies. At hearing, counsel for AHFC conceded that reliance on this ground of § 523(a)(4) for relief was tenuous. In light of the authority presented, the Court finds this single mention, along with other evidence, insufficient to create a fiduciary relationship within the meaning of § 523(a)(4). *See In re Clifton, supra,* at 668. "An agreement which is essentially a commercial security agreement in which the creditor has used trust language and imposed obligations on the debtor to secure repayment of his loan does not create the fiduciary relationship required by § 523(a)(4)." *In re Levitan,* 46 B.R. 380, 385 (Bankr.E.D.N.Y.1985). Also, at no time did AHFC mention the requirement or insist upon its compliance.

■ Neither does the fact that, as president of Valley Cycle Sales, the Debtor executed a personal guarantee place him in a fiduciary capacity with regard to AHFC. As the Bankruptcy Court recognized in *In re Levitan, supra,* at 387:

... "One who signs as primary guarantor to a fiduciary's agreement does not thereby make himself a fiduciary of the original agreement.

The mere fact that a person becomes a surety on a bond of a fiduciary does not place the surety's obligation within clause (4), and the claim against the surety who becomes bankrupt is dischargeable, although the claim against his principal would not be. 3 *Collier on Bankruptcy,* § 523.14 at 523–96."

■ Alternatively, counsel for AHFC contends that the debt is nondischargeable under the portion of § 523(a)(4) on the basis of embezzlement. Embezzlement is defined as the fraudulent appropriation of

property by a person to whom such property has been entrusted or into whose hands it has lawfully come. 3 *Collier on Bankruptcy*, § 523.14[3] at 523–98. The initial taking of the property is lawful; however, the subsequent possession becomes unlawful. *In re Freeman*, 30 B.R. 704 (Bankr. W.D.La.1983).

■ With reference to the proof of fraudulent conduct, in this jurisdiction, the Virginia courts and authorities hold that fraud is never presumed, but must be shown by clear, cogent, and convincing evidence. *Brown v. Buchanan*, 419 F.Supp. 199 (E.D.Va.1975); *In re Hazelwood*, 43 B.R. 208 (Bankr.E.D.Va.1984).

"He who alleges fraud must clearly and distinctly prove it, whether by circumstantial or direct evidence. The law does not presume fraud, but on the contrary the presumption is always in favor of innocence and not of guilt, and unless the allegations of fraud are proved relief will be denied." 8B *Michie's Jurisprudence*, Fraud & Deceit, § 55."

The facts of this case do not support a finding of embezzlement. The Debtor has not engaged in any fraudulent activity or intentional wrong depriving AHFC of its funds. The Debtor testified and all the evidence clearly shows that he had little or no knowledge of and was not aware of the problems of cash flow and failure to remit proceeds until he received a call from AHFC in September, 1984. The proceeds from sale of the inventory were not appropriated by the Debtor for his own use. The Debtor testified that, in light of the business difficulties, he did not receive a salary during 1984. AHFC has failed to produce sufficient evidence to satisfy the clear, cogent, and convincing standard.

Counsel for AHFC suggests that this Court should be guided by *In re Freeman, supra,* in which the Bankruptcy Court for the Western District of Louisiana found the amount owed by the debtor, an automobile dealership, to Chrysler Credit Corporation for vehicles sold but unpaid for under terms of the financing agreement to be nondischargeable on the basis of embezzlement. The *Freeman* case is distinguishable from the instant case. The holding in *Freeman* was based on the fact that during the last weeks of the dealership's operation, the debtor wrote a check to himself for over $7,000.00 as a bonus, as well as a check to his son for approximately $1,000.00 for extra labor. From this conduct, the court concluded that it could infer intent and that the debtor intended to defraud Chrysler Credit of the funds and was guilty of embezzlement. The evidence in this case is quite different. It does not suggest a similar diversion of funds to the Debtor or his son. Both individuals testified that the funds did not go toward their personal use. The facts in this case are devoid of such conduct which might reflect intent to defraud.

■ AHFC also seeks to hold the amount due nondischargeable pursuant to § 523(a)(6), which excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." For the debt to be excepted from discharge under § 523(a)(6), both willful and malicious elements must be shown. *In re Hodges*, 4 B.R. 513 (Bankr.W.D.Va.1980).

■ The term "willful" means deliberate or intentional. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 365 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 79 (1978), U.S. Code Cong. & Admin.News p. 5787 (1978); *In re Nuckols*, 47 B.R. 731, 735 (Bankr.E. D.Va.1985); *In re Hazelwood*, 43 B.R. 208, 213 (Bankr.E.D.Va.1984). As the legislative history suggests, to the extent the Supreme Court case of *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1902), held that a looser standard is intended, and to the extent that other cases have relied on *Tinker* to equate a "reckless disregard" standard with the term "willful", they are overruled. S.R.Rep. No. 95–989, 95th Cong., 2d Sess. 79 (1978). An act is "malicious" if it is "wrongful and without just cause or excuse even in the absence of personal hatred, spite, or ill will." *In re Nuckols, supra,* at 735; *In re White*, 18

B.R. 246 (Bankr.E.D.Va.1982); *In re Fussell*, 15 B.R. 1016, 1022 (W.D.Va.1981).

■ In essence, AHFC's position is that the Debtor's failure to remit the proceeds and the use of the proceeds for other expenses of Valley Cycle Sales amounts to willful and malicious injury to their property. A debt arising from the unlawful conversion of the property of another is not specifically stated in § 523(a)(6). However, the legislative history indicates that "willful and malicious injury covers a willful and malicious conversion". 124 Cong.Rec. H 11,095–6 (daily ed. Sept. 28, 1978); S 17,412–3 (daily ed. Oct. 6, 1978). The conversion of another's property without his knowledge or consent done intentionally and without justification and excuse is a willful and malicious injury. 3 *Collier on Bankruptcy*, § 523.16 at 523–112. However, as the Supreme Court noted in *Davis, supra,*

"a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or maliciousness." 293 U.S. at 332, 79 L.Ed. at 397.

Thus, a technical conversion may very well lack any element of willfulness or maliciousness necessary to except the liability from discharge. 3 *Collier on Bankruptcy*, § 523.16 at 523–112.

■ AHFC has failed to produce sufficient evidence to support a finding of willful and malicious injury. There is no suggestion that this Debtor deliberately or intentionally attempted to withhold funds from sale of inventory from AHFC. The Debtor's undisputed testimony is that he was not even aware of the financial problem until the telephone call several days prior to the visit by John Marr, Field Representative of AHFC. When confronted with the situation, Tester spoke to his son in an attempt to resolve the problem. The Debtor indicated that he attempted to obtain funds to pay AHFC through refinancing and through sale of the building in which Valley Cycle Sales conducted busi-

ness. Moreover, the Debtor even offered AHFC a mortgage on his home to satisfy the indebtedness. This was declined. Upon cross-examination, Marr admitted that when he spoke with the Debtor about the problem, he thought that the Debtor was honest and forthright in describing his financial situation and total lack of knowledge of the situation.

■ At most, the Debtor in this case may be accused of negligence in the operation of his business. In hindsight, the Debtor admitted that he should have participated more in the daily operation of the company, and probably gave his son too much responsibility. As this Court has recognized on a prior occasion, however, the requisite element of maliciousness is not proved by a showing of mere negligence. *In re Hodges, supra,* at 516; *see also In re Graham,* 7 B.R. 5, 6 B.C.D. 539 (Bankr.D. Nev.1980).

We reject the suggestion of counsel for AHFC that several floor-plan financing cases which have found the debt nondischargeable should control this case. *See Matter of Klix,* 23 B.R. 187 (Bankr.E.D. Mich.1982); *In re Talcott,* 29 B.R. 874 (Bankr.D.Kan.1983); *In re Emporelli,* 42 B.R. 814 (Bankr.W.D.Pa.1984). However, upon careful examination, we determine that these cases are distinguishable from the instant case. In *Klix, supra,* the debtor filed applications for certification of title prior to receipt of cash for the sales. The Bankruptcy Court for the Eastern District of Michigan, expressly differing with our decision in *Hodges, supra,* and the legislative history to § 523(a)(6), relied on the *Tinker v. Colwell* definition of malice to find the debt nondischargeable. *See also In re Auvenshire,* 9 B.R. 772 (Bankr.W.D. Mich.1981). In *Talcott, supra,* the debtor cannibalized the secured collateral for parts and continued to draw a substantial salary from the dealership, including rental payments for an unused storage facility. Finally, in *Emporelli,* the court based its finding of nondischargeability on the fact that the debtor concealed the sale of items out of trust from the secured party as long as possible. There is no showing in the instant case of the type of egregious con-

duct or intentional acts by the Debtor for which the debts in these cases were excepted from discharge. The Debtor has not secreted funds from AHFC, set up a scheme to defraud, used the money for his own personal use, or destroyed the subject collateral. On the contrary, the majority of cases involving floor-plan financing have found the outstanding obligations to be discharged in the absence of aggravating factors. *In re Miles, supra; In re Graham, supra; In re Clifton,* 32 B.R. 666 (Bankr.D.N.M.1983); *In re Tocci,* 39 B.R. 1000 (Bankr.S.D.Fla.1983); *In re Hickey,* 41 B.R. 601 (Bankr.S.D.Fla.1984); *In re Levitan, supra; In re Gallaudet, supra.*

In light of the evidence presented and the construction of the exceptions of § 523 in favor of the Debtor, for the reasons expressed herein, an Order will be entered holding the debt dischargeable.