In re Anas Ahmed **SHAH and Naiyara Imran Shah, individually and d.b.a. The Sound Place, and Quality Maintenance, Debtors.**

**BORG–WARNER ACCEPTANCE CORPORATION, Plaintiff,**

v.

**Anas Ahmed SHAH and Naiyara Imran Shah, individually and d.b.a. The Sound Place, Defendants.**

**Bankruptcy No. LA87–14142VZ. Adv. No. LA87–01939VZ.**

United States Bankruptcy Court, C.D. California.

Feb. 10, 1989.

---

William Ford, Santa Ana, Cal., for plaintiff/creditor Borg Warner.

Carl B. Pearlston, Jr., Torrance, Cal., for debtors/defendants.

## MEMORANDUM OF DECISION

VINCENT P. ZURZOLO, Bankruptcy Judge.

### I.

### STATEMENT OF FACTS

Anas Ahmed Shah and Naiyara Imran Shah ("Defendants") operated several retail stereo stores in Los Angeles County and Orange County. On February 5, 1986, Defendants and Borg–Warner Acceptance Corporation ("Plaintiff") executed an Inventory Security Agreement and Power of Attorney ("Plaintiff's Inventory Security Agreement"). Pursuant to the Inventory Security Agreement, Plaintiff advanced funds to Defendants to purchase stereo equipment for sale in their retail outlets. It was agreed that Plaintiff would have a

security interest in the stereo equipment purchased by Defendants with money borrowed from Plaintiff and in the cash proceeds generated by the sale of said stereo equipment. Plaintiff was also granted a security interest in all of Defendants' accounts receivable, inventory, and equipment.

In April 1981, prior to the above-described transaction, Defendants entered into a similar floor-financing agreement with ITT Diversified Credit Corporation, later known as ITT Commercial Finance Corporation ("ITT"). Defendants executed and recorded a UCC–1 Financing Statement in favor of ITT on April 20, 1981. As Defendants opened additional stereo stores, ITT and Defendants executed amendments to ITT's UCC–1 Financing Statement to encumber collateral located at these new stores. ITT's security interest included all of Defendant's then owned and after acquired inventory and proceeds thereof.

On May 7, 1986, Plaintiff sent a UCC–6 Notification Letter to ITT ("the Letter"). The Letter put ITT on notice that Plaintiff expected to acquire a purchase money security interest in certain inventory collateral or proceeds thereof. The Letter, however, only referred to one of Defendants' stereo stores and was sent after Defendant obtained possession of inventory financed by Plaintiff.

The Inventory Security Agreement required Defendants to segregate all cash proceeds generated by the sale of inventory financed by Plaintiff into a separate account. This provision was ignored by the parties throughout the course of their relationship. Instead, Defendants deposited all cash proceeds generated by the sale of inventory financed by Plaintiff, and apparently also inventory financed by ITT, into its general business account. Defendants used these commingled funds to pay the expenses of their business, including paying the advances made by Plaintiff. Plaintiff did not allege or prove that Defendants used any of these funds for improper or non-business purposes.

In late 1986, Defendants' business began to falter. In January 1987, Defendants turned over to Plaintiff all the inventory in Defendants' possession that Plaintiff had financed. The final blow came on February 4, 1987 when ITT obtained a writ of attachment in state court and seized all of Defendants' equipment, inventory, and accounts receivable.

On July 14, 1987, Defendants filed their voluntary petition under Chapter 7 of the United States Bankruptcy Code. On that date, Defendants owed Plaintiff approximately $69,749.25. Defendants also owed ITT approximately $140,000 for the deficiency remaining after ITT had repossessed and liquidated all of its remaining collateral. On September 18, 1987, Plaintiff filed its Complaint to Determine Dischargeability of Debt under Sections 523(a)(2), 523(a)(4), and 523(a)(6) of the Bankruptcy Code. By the time this adversary proceeding came to trial on December 21, 1988, Plaintiff had abandoned its claims under Sections 523(a)(2) and 523(a)(4), and proceeded solely under Section 523(a)(6).

## II.

## ISSUES

Plaintiff claims that Defendants' use of Plaintiff's cash proceeds collateral constitutes a tortious conversion that is malicious and willful within the meaning of Section 523(a)(6). Two difficult and significant issues arise from this dispute:

(1) Did Plaintiff have any personal property subject to conversion? and

(2) If Defendants did convert Plaintiff's property, was that conversion malicious and willful within the meaning of Section 523(a)(6)?

## III.

## DISCUSSION

A. *Conversion of Collateral of a Completely Undersecured Creditor*

Section 523(a)(6) of the Bankruptcy Code provides in relevant part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

The tort of conversion is one type of wrongful behavior that may be nondischargeable under Section 523(a)(6). *See In re Kemble,* 776 F.2d 802 (9th Cir.1985); *In re Cecchini,* 780 F.2d 1440 (9th Cir.1986); and *In re Hodges,* 83 B.R. 25 (Bankr.N.D. Cal.1988).

To establish a claim for conversion, Plaintiff must prove the following: (1) wrongful assumption of dominion or control over the personal property of another; (2) to the exclusion of possession by the owner; (3) in repudiation of the owner's rights; and (4) damages. *See In re James E. O'Connell Co., Inc.,* 799 F.2d 1258 (9th Cir.1986); *In re Thomas,* 47 B.R. 27 (Bankr.S.D.Cal.1984).

The threshold issue for Plaintiff is whether it had any personal property over which Defendants asserted wrongful dominion. When the value of collateral encumbered by a creditor's security interest is less than the amount owed to the creditor, the creditor has an unsecured claim for the amount of the difference. 11 U.S.C. Section 506(a). *Cf.* Cal.Comm.Code § 9504(2) (debtor liable for deficiency after disposition of collateral). Thus, a completely undersecured creditor would have no property interest in the overencumbered collateral.

It is undisputed that ITT, which had a prior-in-time security interest in essentially all of Defendants' personal property, was undersecured in the approximate amount of $140,000. If Plaintiff's security interest was second in priority to ITT's, this would mean that Plaintiff was completely undersecured, had no property interest in the collateral encumbered by its and ITT's security interests, and thus had no personal property that could be converted by Defendants.

Plaintiff argues that with regard to the inventory that it financed for Defendants and the resulting cash proceeds, Plaintiff's security interest had priority over ITT's security interest pursuant to Calif.Comm.Code § 9312(3) which provides as follows:

(3) A perfected purchase money security interest in inventory has priority over a conflicting security interest *in the same inventory and also has priority in identifiable cash proceeds received on or before the delivery of the inventory* to a buyer if all of the following occur:

(a) The purchase money security interest is perfected at the time the debtor receives possession of the inventory.

(b) The purchase money secured party gives notification in writing to the holder of the conflicting security interest if the holder had filed a financing statement covering the same types of inventory (i) before the date of the filing made by the purchase money secured party, or (ii) before the beginning of the 21–day period where the purchase money security interest is temporarily perfected without filing or possession (subdivision (5) of Section 9304).

(c) The holder of the conflicting security interest receives the notification within five years before the debtor receives possession of the inventory.

(d) The notification states that the person giving the notice has or expects to acquire a purchase money security interest in inventory of the debtor, describing such inventory by item or type. (Emphasis added.)

Plaintiff is correct in arguing that its security interest would be prior to ITT's if it had complied with Section 9312(3). Plaintiff, however, did not.

First, Plaintiff gave notice of its purchase money security interest to ITT for only one of Defendants' retail stores. Thus, the priority provided by Section 9312 arguably would only apply to that inventory bought and sold at the one store described in the Letter.

Second, Section 9312(3)(b)(i) provides that notice to the prior secured creditor must be given before filing of the purchase-money secured creditors' UCC–1 Financing Statement. However, Plaintiff's own evidence clearly shows that the Letter was not sent until three months after Plaintiff filed its UCC–1 Financing Statement.

Third, Section 9312(3)(c) provides that notification to the prior secured creditor is required before the *debtor receives* possession of the financed inventory. Plaintiff also failed to comply with this requirement as evidenced by Defendants' payment to Plaintiff for inventory sold before the Letter was sent to ITT.

Fourth, and most damaging to Plaintiff's argument, is the introductory language in Section 9312(3). A holder of a purchase money security interest can obtain priority over a prior-in-time security interest only with regard to *identifiable* cash proceeds.[1] Plaintiff has failed to identify any cash proceeds that Defendants allegedly converted.

Plaintiff's Inventory Security Agreement provides that the cash proceeds of each sale of inventory financed by it would be deposited in a segregated account. Throughout the course of dealing between the parties, however, Plaintiff always accepted payment by way of checks drawn from Defendants' general business account. Plaintiff never required the proceeds to be deposited into a segregated account. By waiving the protection of a segregated account, Plaintiff made it impossible to identify its cash proceeds and thus assert priority over ITT pursuant to Section 9312(3).

 Plaintiff failed to establish the priority of ·its security interest over ITT's. Therefore, Plaintiff's security interest was subject to ITT's security interest in all collateral subject to ITT's security interest, including the inventory and cash proceeds generated by Plaintiff's financing. Because the value of all that collateral was significantly less than the amount owed to ITT, Plaintiff at this time was completely undersecured and it therefore had no personal property interest that could be converted.

### B. *Willful and Malicious Conversion of Secured Creditor's Collateral*

There are numerous reported bankruptcy cases involving a floor-financing creditor suing a debtor for nondischargeability of its debt. The secured creditor will usually argue as Plaintiff does here, that it was willful and malicious conversion for the debtor not to return the inventory or the proceeds from the sale of such inventory.

The *Chrysler Credit Corporation v. Perry Chrysler Plymouth*, 783 F.2d 480 (5th Cir.1986), the court considered a willful and malicious conversion of a floor-financing secured creditor's proceeds. The debtor and Chrysler Corporation had an agreement under which Chrysler would finance the purchase of cars for the debtor's Chrysler automobile dealership. After the dealership and its principals went into bankruptcy, Chrysler filed a nondischargeable adversary proceeding against the principals alleging a willful and malicious conversion under Section 523(a)(6). The testimony showed that the principals had taken over $100,000.00 of Chrysler's proceeds from sales of automobiles to Las Vegas for gambling purposes. The principal testified that he had hoped to win enough money to return the automobile dealership to financial stability. The court rejected the principal's excuse and stated:

> [The principal] knew that the money he took to Las Vegas was the property of Chrysler Credit. Neither common sense nor statutory construction can stretch his professed purpose of winning enough money to save his dealership into a valid cause or excuse.

*See also, In re Klix*, 23 B.R. 187 (Bankr.E.D.Mich.1982); *In re Branch*, 54 B.R. 211 (Bankr.Colo.1985).

In other cases directly on point with this case, courts have held that a debtor's use of proceeds collateral for ordinary business expenses does not rise to the level of willful and malicious behavior as required in Section 523(a)(6).

In *In re Graham*, 7 B.R. 5 (Bankr.Nev. 1980), the court was asked to determine whether the debtor's use of cash proceeds collateral for ordinary business expenses constituted willful and malicious conversion under Section 523(a)(6). In declining to

---

**1.** Defendants had already returned all inventory subject to Plaintiff's purchase money security interest to Plaintiff. Therefore, Plaintiff's claim concerns only cash proceeds.

hold the debt nondischargeable, the *Graham* court held:

A conversion under the Code must be willful and malicious. Mere negligence is insufficient. There was no proof here that the Graham or Blonigan [debtors] actually removed inventory. True, the inventory has disappeared and although no sales slips were produced, it is probably true as testified by Blonigan that the inventory was sold, the money deposited in the general account and used by B & B for general operating expenses. That is not willful and malicious.

*Id.* at p. 7. *See also, In re Clifton*, 32 B.R. 666 (Bankr.N.M.1983) (mere negligence in money management is not willful and malicious behavior under Section 523(a)(6)).

The Ninth Circuit in *In re Cecchini*, 780 F.2d 1440 at 1443 (9th Cir.1986), has defined willful and malicious injury under Section 523(a)(6):

When a wrongful act such as conversion, done intentionally, necessarily produces harm and is without just cause or excuse, it is "willful and malicious" even absent proof of specific intent to injury.

The *Cecchini* standard provides little practical guidance to a trial court that must determine whether conduct is "willful and malicious" under Section 523(a)(6). Broadly read, the *Cecchini* holding could stand for the proposition that *any* intentional tort is willful and malicious. Such a reading, as urged by Plaintiff, does not comport with the "fresh start" policy underlying the debt discharge provisions of the Bankruptcy Code.

The case of *In re Hodges*, 83 B.R. 25 (Bankr.N.D.Cal.1988), clarifies the *Cecchini* holding. The *Hodges* court had to determine whether the debtor therein, who converted consumer goods without payment to a secured creditor, caused a willful and malicious injury. In declining to find liability under Section 523(a)(6), the court stated at p. 27:

It should be noted that the decision of the Court of Appeals in *In re Cecchini*, 780 F.2d 1440 (9th Cir.1986), does not stand for the proposition that any disposition of collateral creates a nondischargeable debt. Such a reading would put the decision in direct conflict with the Supreme Court holding in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 (1934), 55 S.Ct. 151, 153, 79 L.Ed. 393, [debtor converted inventory of floor-financing secured creditor] that a willful and malicious injury does not follow as of course from every technical conversion. What *Cecchini* held is that if a conversion done intentionally *necessarily produces harm*, and is *without cause or excuse*, the debt may be nondischargeable. 780 F.2d at 1443.

Even if Plaintiff had a property interest that could be converted, Plaintiff has failed to establish that Defendants' use of Plaintiff's cash proceeds collateral necessarily harmed Plaintiff. To make this showing, it is not enough for Plaintiff to prove that Defendants' intentional acts were the proximate cause of harm to Plaintiff. Rather, I conclude that under *Cecchini* it is necessary for Plaintiff to prove that Defendants committed an intentional act that the Defendants knew, or reasonably should have known, would harm Plaintiff or the property of Plaintiff, thereby *necessarily* causing such harm.

In this case, Defendants deposited Plaintiff's cash proceeds collateral in their general business account, as they always had done. They used those commingled funds to pay the ordinary expenses of their business, including, at one point, completely repaying Plaintiff. Plaintiff has failed to establish that Defendants knew, or reasonably should have known, that this disposition of Plaintiff's cash proceeds collateral, a disposition that Plaintiff accepted by its waiver of its cash segregation protections, would harm Plaintiff. Rather, it was most likely the only way Defendants could keep their business alive and thus generate income to pay the bills of its creditors, including Plaintiff.

Even if Defendants' intentional acts necessarily produced harm to Plaintiff or its property, I find and conclude that Defendants' alleged conversion of Plaintiff's cash proceeds collateral was excused by Plaintiff's waiver of its contracted for protection in the form of a segregated account. My finding and conclusion is bolstered by Plaintiff's reliance upon Califor-

nia Commercial Code § 9312 which provides a priority to holders of purchase money security interests in identifiable cash proceeds. If Plaintiff truly desired to establish a priority security interest in its inventory and cash proceeds collateral, the only practical way of identifying its cash proceeds would have been to insist upon depositing those proceeds into a segregated account. Plaintiff's failure to oversee and protect the disposition of its collateral in and of itself excuses Defendants of any liability under Section 523(a)(6).

## IV.

## CONCLUSION

This memorandum of decision constitutes findings of fact and conclusions of law within the meaning of Bankruptcy Rule 7052. The parties shall bear their own costs. Defendants shall lodge a proposed judgment consistent with this memorandum.