In re Jack Elvin LITTLETON & Karen Littleton, Debtors.

BORG–WARNER ACCEPTANCE CORPORATION, Appellant,

v.

Jack Elvin LITTLETON & Karen Littleton, Appellees.

In re Joel Dean MOORE & Eunice Eileen Moore, dba K & V Applied Music, Debtors.

BORG–WARNER ACCEPTANCE CORPORATION, Appellant,

v.

Joel Dean MOORE & Eunice Eileen Moore, dba K & V Applied Music, Appellees.

BAP No. EC 88–1935–AsPMo.
Bankruptcy Nos. 286–05604–B–7,
287–02677–B–11.
Adv. Nos. 287–0570, 287–0282.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted May 24, 1989.

Decided Oct. 26, 1989.

Ronald H. Sargis, Hefner, Stark & Marois, Sacramento, Cal., for appellants.

Mark W. Briden, Redding, Cal., for appellees.

Before ASHLAND, PERRIS and MOOREMAN, Bankruptcy Judges.

ASHLAND, Bankruptcy Judge:

Transamerica Commercial Finance Corporation appeals from the bankruptcy court's determination that the debts owed by Jack Littleton, Joel Moore, and Eunice Moore did not result from the willful and malicious conduct of the debtors as required by Bankruptcy Code § 523(a)(6) [11 U.S.C. § 523(a)(6)] and were, therefore, dischargeable. We affirm.

## FACTS

Transamerica Commercial Finance Corporation is a commercial financing company that provides inventory financing to retail businesses. The debtors, Jack Littleton, Joel Moore, and Eunice Moore, were officers, directors and shareholders of Jacob's Appliance and TV, Inc. (Jacob's). Jacob's sold and serviced appliances. In February 1985, Jacob's entered into an "Inventory Security Agreement and Power of Attorney" with Transamerica to provide the financing of inventory purchases. Transamerica was given a security interest in both the inventory purchased by Jacob's, and the proceeds from the sale of the inventory.

The security agreement required Jacob's to pay the cost price of each item of financed inventory to Transamerica as sales occurred. The payments to Transamerica were to be made in one of two ways. Jacob's was to report sales of inventory on a weekly basis and remit payment for the cost of sold inventory each week. In addition, Transamerica conducted monthly inspections of the inventory. If an item of inventory was not on the premises and not listed on a weekly sales report, Jacob's was required to pay Transamerica the cost of the item, it being presumed that the item had been sold without being reported.

The security agreement also provided that in the event of a default by Jacob's, Transamerica was entitled to immediate possession of its collateral. A default under the security agreement was defined as, among other things, the failure to pay amounts due to Transamerica as they became due. Jacob's made the required pay-

ments to Transamerica up to and including June 5, 1986. On July 11, 1986 when Transamerica inspected the premises it was determined that inventory with a cost price of $63,422.63 was sold. Jacob's was not able to pay Transamerica the full amount, but was able to pay $27,039.95, leaving a balance due of $36,382.68. This constituted a default by Jacob's under the security agreement. Transamerica inspected the inventory again prior to the July 24, 1986 bankruptcy filing, and determined that additional inventory with a cost of $33,685.34 had been sold by Jacobs without making payment to Transamerica. On the date of bankruptcy, the balance owing was $70,068.02.

The debtors did not guarantee the debts of the corporation, thus the debtors would not ordinarily be liable for the corporate debt. Transamerica contends that as a result of Jacob's failure to pay the proceeds of the inventory sales when due, the debtors converted proceeds of the sales, or in the alternative embezzled the proceeds, and therefore the debts are not dischargeable pursuant to § 523(a)(6) or (a)(4).

The trial court found that Transamerica did not meet its burden of proof on the § 523(a)(4) embezzlement claim. On the claim of conversion, the bankruptcy court held that the method by which the payments were made and the inventory was handled, although intentional, did not constitute acts that necessarily produced harm, and that were without just cause or excuse, and therefore were not malicious under § 523(a)(6).

## ISSUE

Whether corporate officers who fail to disburse to a secured creditor proceeds from the sale of inventory, in which the creditor has a secured interest, incur a debt in the personal bankruptcies of the officers that is nondischargeable under § 523(a)(4) or (a)(6).

## STANDARD OF REVIEW

■ Findings of fact by the bankruptcy court are not set aside unless clearly erroneous while conclusions of law are reviewed independently. *In re Posta,* 866 F.2d 364, 366–67 (10th Cir.1989). In this case, the facts are relatively undisputed. The primary question is whether the debtors' conduct was malicious as that term is used in § 523(a)(6).

## DISCUSSION

Transamerica argues that the debtors' intentional sale of inventory and consequent failure to remit payment to Transamerica in violation of the terms of the security agreement was by its nature malicious. Section 523(a)(6), the relevant provision in the Bankruptcy Code, provides:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or the property of another entity;

11 U.S.C. § 523(a)(6).

■ Generally, such injury includes the conversion of property subject to a creditor's security interest. *Posta,* 866 F.2d at 367; *In re Rebhan,* 842 F.2d 1257 (11th Cir.1988); *In re Long,* 774 F.2d 875 (8th Cir.1985). For the debt to be nondischargeable under § 523(a)(6) the debtors' conversion of property must have been both willful and malicious. The creditor objecting to the discharge of the debt has the burden of proving both elements by clear and convincing evidence. *In re Tilbury,* 74 B.R. 73, 77 (9th Cir. BAP 1987), *aff'd,* 851 F.2d 361 (9th Cir.1988); *see Posta,* 866 F.2d at 367.

The first question is whether there was a wrongful act by the debtors, in this case conversion. *Wachovia Bank and Trust Co. v. Banister,* 737 F.2d 225 (2nd Cir.), *cert. denied,* 469 U.S. 1035, 105 S.Ct. 509, 83 L.Ed.2d 400 (1984). In California the elements of a conversion cause of action are (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages. *Baldwin v. Marina City Properties, Inc.,*

79 Cal.App.3d. 393, 145 Cal.Rptr. 406 (1978).

■ The third element, damages, is straightforward. If a conversion occurred, Transamerica was damaged in that it lost collateral from which to satisfy its debt. The first and second elements present a more difficult question. As a secured party, although not an owner, under California law Transamerica has a special interest in the collateral securing its debt, and consequently may bring an action for conversion, only if upon default the security agreement allows them to take possession. *Baldwin,* 79 Cal.App.3d at 410, 145 Cal.Rptr. 406; *see Everfresh, Inc. v. Goodman,* 131 Cal. App.2d 818, 281 P.2d 560 (1955). The security agreement in this case provides that Transamerica, in the event of a default, has the right to take immediate and exclusive possession of the collateral. Collateral as defined in the security agreement includes proceeds. Thus under California law Transamerica has a sufficient possessory interest to state a cause of action for conversion.

■ Finally, money cannot be the subject of conversion unless a specific, identifiable sum is involved. 5 B. Witkin, *Summary of California Law,* Torts § 614, p. 710 (9th ed. 1988). As a general rule, "where the relationship of debtor and creditor only exists, conversion of the funds representing the indebtedness will not lie against the debtor, unless he holds the deposit in a fiduciary capacity, and is bound to return to the owner the identical money." *Watson v. Stockton Morris Plan Co.,* 34 Cal.App.2d 393, 403, 93 P.2d 855 (1939); *accord Haigler v. Donnelly,* 18 Cal.2d 674, 681, 117 P.2d 331 (1941) ("money cannot be the subject of an action for conversion unless a specific sum capable of identification is involved (*Baxter v. King,* 81 Cal.App. 192 [253 P. 172])"). In this case Transamerica asserts that the diversion of *proceeds* to pay other creditors of the business constituted the act which forms the basis for the claim that the debtors converted Transamerica's property. The act complained of was not the sale of the inventory or the depositing of the funds in a corporate account, but the failure by the debtors to remit the proceeds to Transamerica at the end of the month per their agreement.

■ The Second Circuit addressed the question of whether proceeds subject to a security interest may be the subject of conversion. *Wachovia Bank and Trust Co. v. Banister,* 737 F.2d 225 (2nd Cir. 1984). In *Banister* the bank argued that a corporate officer who failed to disburse to the bank, a secured creditor, proceeds from the sale of inventory in which the bank had a security interest, incurred a debt that was non-dischargeable in the personal bankruptcy of the officer. The debtor was the president and sole stockholder of the business and had entered into a floor financing agreement in order to finance purchases of inventory.

The Second Circuit applying New York law held that in the absence of a duty imposed upon the corporation to segregate proceeds and remit those very funds to the bank, the president did not commit the tort of conversion by diverting the proceeds to the corporation's general business purposes, even though the corporation ultimately defaulted on its obligation to pay the bank. *Banister,* 737 F.2d at 227. The language used in the security agreement that created the obligation in *Banister* is virtually identical to the language of the agreement in this case. The *Banister* court also stated that the New York state law coincides with its view of federal law, that the bank, by achieving a secured interest in the proceeds that entitled it to priority against other creditors did not thereby become entitled to pierce the barrier of a bankruptcy discharge. *Id.* at 228; *cf. In re Simmons,* 9 B.R. 62, 64–65 (Bankr.S.D.Fla. 1981).

Some bankruptcy courts have impliedly rejected the *Banister* court's approach. These courts have merely stated in conclusory fashion that the conduct complained of, for example, failure to pay the secured creditor, proceeds derived from the sale of collateral, is tortious conduct. *See In re Branch,* 54 B.R. 211, 216 & 218 (Bankr.D. Colo.1985); *In re Emporelli,* 42 B.R. 814

(Bankr.W.D.Pa.1984); *Matter of Klix,* 23 B.R. 187 (Bankr.E.D.Mich.1982); *In re Penning,* 22 B.R. 616 (Bankr.E.D.Mich. 1982). These courts tend to focus on whether the conduct was malicious without first analyzing whether the tort of conversion has been committed.

There are no California cases directly on point. However, several recent cases at least implied that cash "proceeds", as that term is used in Cal.Com.Code § 9306, may be the subject of a conversion. *See American Nat'l Bank v. Cloud,* 201 Cal.App.3d 766, 247 Cal.Rptr. 325 (1988); *Producers Cotton Oil Co. v. Amstar Corp.,* 197 Cal. App.3d 638, 242 Cal.Rptr. 914 (1988).

We find the language of Cal.Com.Code § 9306 to be particularly instructive in this case. Section 9306 which defines proceeds and a secured party's rights on disposition of collateral provides:

> (2) ... a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also *continues in any identifiable proceeds* including collections received by the debtor.

Cal.Com.Code § 9306(2) (West 1989) (emphasis added). The debtors in this case returned all inventory subject to the security interest to Transamerica, therefore, Transamerica's claim encompasses only cash proceeds derived from the sale of inventory.

The security agreement executed by the parties provides that the cash proceeds of each sale of inventory financed by Transamerica would be held in a segregated account. The testimony, in this case, evidences that: 1) a separate account was never established; 2) Transamerica was aware that a separate account was never established; and 3) Transamerica accepted payments by way of checks drawn from the debtors' general business accounts. In short, through its course of dealing with the debtors, Transamerica never required the proceeds to be deposited into a segregated account.

In the recent case of *In re Shah (Borg-Warner Acceptance Corporation v. Shah),* 96 B.R. 290 (Bankr.C.D.Cal.1989) the bankruptcy court determined that a secured creditor was not entitled to a non-dischargeability judgment under § 523(a)(6) because "Defendants deposited Plaintiff's cash proceeds collateral in their general business account, *as they had always done.* They used those commingled funds to pay ordinary expenses of their business, including, at one point, completely repaying Plaintiff." *Shah,* 96 B.R. at 295 (emphasis added). In addition, the bankruptcy court held that the secured creditor, through its course of dealing, had waived its "cash segregation protections." *Id.* The *Shah* court reasoned that since the cash proceeds were not segregated and not otherwise identifiable they were not subject to the security interest and, therefore, the creditor had no personal property interest that could be converted. *Id.* at 293–94.

The facts in *Shah* are almost identical with those of this case. The debtors were allowed to place proceeds of inventory sales into the same general account from which they paid their ordinary business expenses. By waiving the protection of a segregated account, Transamerica made it impossible to *identify* cash proceeds, as required by § 9306(2). Transamerica cannot now be heard to complain that the disposition of funds in the general business account to pay ordinary business expenses constituted willful and malicious conduct with respect to its security interest in the inventory proceeds.

█ We, therefore, adopt the reasoning in *Shah* and hold that the disposition of Transamerica's cash proceeds collateral was not malicious under § 523(a)(6), and that even if the conduct were malicious the alleged conversion was excused by Transamerica's waiver of its contracted for protection in the form of a segregated account. *Shah,* 96 B.R. at 295; *accord In re Sharp,* 102 B.R. 764 (9th Cir. BAP 1989).

Even if Transamerica's waiver of the contract provision for a segregated account were not fatal and consequently the proceeds of inventory sales could be identified,

there would still be serious questions about the application of § 523(a)(6) to the facts in this case. The leading Ninth Circuit case defining the terms willful and malicious is *In re Cecchini*, 780 F.2d 1440 (9th Cir. 1986). The *Cecchini* court stated that the word willful means deliberate or intentional. *Id.* at 1443 (quoting 3 L. King, *Collier on Bankruptcy* § 533.16 at 523–118 (15th ed. 1983)). Thus, the willful element is straightforward. It simply addresses whether the debtors performed the acts complained of intentionally, as opposed to unintentional or accidental conduct. There is little question that the debtors in this case knew and understood how they were to make payments under the floor financing agreement, and further understood that writing checks for other business debts while Transamerica remained unpaid was in violation of the security agreement.

■ The issue here is whether in acting in violation of the agreement the debtors acted maliciously. In *Cecchini* the court held that the creditor need not show a specific intent to injure, but rather, the intent may be inferred from the nature of the act. *Id.* at 1443. The court stated:

When a wrongful act such as conversion, done intentionally, necessarily produces harm and is without just cause or excuse, it is "willful and malicious" even absent proof of a specific intent to injure.

*Id.* In other words, malice may be implied from the wrongful act.

On the issue of whether the debtors conduct was malicious, the bankruptcy court held:

... I had some question about the liability of individuals, shareholders, or officers of a corporation for the debts of a corporation where there has not been a guarantee or similar arrangement that we usually see in the context of the methods by which owners of corporations are made to be liable for debts....

The next requirement is malice. Under *In re Cecchini*, malice is in effect implied. It is implied by the requirement that a wrongful act, such as conversion which is done intentionally, if it necessarily produced harm, and is without [just]

cause, or excuse, then it is malicious, even absent specific proof of intent to injure.

And that's where I believe this case is to be decided today.

I have found that the defendants at all times were acting with the hope and expectation, perhaps improvidently, but sincerely hoped that they could keep the business going. They cooperated with the plaintiff until the time of the filing of the bankruptcy of Jacobs Appliance and TV.

... And indeed at the time of the filing of the bankruptcy petition for Jacobs Appliance and TV, Inc., it was filed as a Chapter 11, and an attempt was made to continue in business.

That leads me to conclude that the method by which the payments were made, and the inventory was handled, although it was intentional, did not constitute acts that necessarily produced harm, and that were without just cause or excuse. It turned out that they produced harm when the end of the line was reached. But there was a real expectation, including an expectation on the part of, at least some actors with the plaintiff, until very nearly the end that there was a chance that things would be worked out.

So based upon that, I conclude that the debts are dischargeable and the judgment should be entered for the defendants.

Transamerica argues that if the act complained of, in this case conversion, is done intentionally and causes injury, then the resulting debt is nondischargeable. While this is a correct statement of law, it is not a complete statement of the law as it now stands. The decision in *Cecchini* does not stand for the proposition that any disposition of collateral in violation of the security agreement creates a nondischargeable debt. Such a reading would put *Cecchini* in direct conflict with the Supreme Court's holding in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). *See In re Hodges*, 83 B.R. 25 (Bankr.N.D.Cal.1988).

In *Davis*, an auto dealer held its inventory under trust receipts forbidding sale without the consent of the secured creditor. One of Davis' salesmen sold an auto without obtaining the consent of the secured creditor. Davis proffered testimony that in the past the company had been allowed to sell cars without the express consent of the secured creditor and simply account for the proceeds. However, on this occasion Davis was unable to make payment to the secured creditor and filed bankruptcy.

The Supreme Court reiterated the rule enunciated in *McIntyre v. Kavanaugh*, 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205 (1916) and *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), both of which were relied on by the *Cecchini* court, but refused to hold the debt nondischargeable. Instead the Supreme Court concluded:

> [A] wilful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without wilfulness or malice. There may be an honest, but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a wilful and malicious one. ... The discharge will prevail as against a showing of conversion without aggravated features.

*Davis*, 293 U.S. at 332–33, 55 S.Ct. at 153 (citations omitted).

Thus it appears under *Davis* that a simple interference with legal rights is not enough in and of itself to prevent discharge of a debt. There must be some "aggravated features," associated with the conversion. *Id.* at 333, 55 S.Ct. at 153. It has not been clearly established precisely what type of conduct is sufficiently egregious to constitute malice in this context. *See In re Long*, 774 F.2d 875, 879 (8th Cir.1985). There is clearly a tension between the holding in *Davis* and that of the Ninth Circuit in *Cecchini*. This tension has lead to divergent results in cases dealing with security

agreements that have been breached by the debtor.

As pointed out by the appellant, one line of cases views the breach of a security agreement, if knowingly done, as an obvious intentional harm to the rights of the secured creditor; and therefore, characterizes the conduct as "willful and malicious". *See Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257 (11th Cir.1988); *In re Branch*, 54 B.R. 211 (Bankr.D.Colo.1985); *In re Emporelli*, 42 B.R. 814 (Bankr.W.D.Pa.1984); *Matter of Klix*, 23 B.R. 187 (Bankr.E.D. Mich.1982); *Matter of Ries*, 22 B.R. 343 (Bankr.W.D.Wis.1982).

Other bankruptcy courts treat the breach of the security agreement as a "technical conversion" under *Davis*, and require a stronger showing of malice than may simply be inferred from the breach. *See In re Posta*, 866 F.2d 364 (10th Cir.1989); *In re Long*, 774 F.2d 875 (8th Cir.1985); *In re Gallaudet*, 46 B.R. 918 (Bankr.D.Vt.1985); *In re Levitan*, 46 B.R. 380 (Bankr.E.D.N.Y. 1985).

In defining the level of culpability necessary to bar a debtor's discharge, the standard formulated by the *Cecchini* court is that: 1) the act must be wrongful, 2) the act must be done intentionally, 3) the act must *necessarily produce harm* and be without just cause or excuse. *Cecchini*, 780 F.2d at 1443. In order to reconcile *Davis* with *Cecchini*, it is necessary to read the words "necessarily produces harm" to mean that the act must be targeted at the creditor, at least in the sense that the conduct is certain or almost certain to cause financial harm. *Accord Long*, 774 F.2d 881. In *Cecchini* the two partners who misappropriated prepayment checks apparently intended to convert the money to their own use.

In this case there was evidence that the debtors cooperated with the plaintiff in seeking additional financing that would allow the company to remain in business. Additionally, the debtors offered a third trust deed on their residence as additional security for the loan. There was no evidence that the debtors used any of the corporate funds for their personal benefit,

and there is no evidence that any other creditor was paid other than in the ordinary course of business in the month before bankruptcy was filed.

In addition, there was evidence that Transamerica was aware of the sold-out-of-trust situation for some time and that the condition had in fact existed for over a year. These facts suggest Transamerica's acquiescence, at least to some extent, in the conduct of the debtors with respect to the sold-out-of-trust condition. As such, Transamerica fits within the *Davis* fact pattern, and should not now prevail against the bankruptcy discharge.

The bankruptcy court was entitled to rely on the debtors' testimony as to their intent to benefit Transamerica and other creditors of the company. While the debtors' conduct must be disapproved, there was not error below in ruling that the debtors did not act maliciously, as that term is used in § 523(a)(6).

■ Transamerica also argues that the debtors embezzled the proceeds of the inventory sales. Transamerica relies on Cal. Penal Code § 504b which states:

> Where under the terms of a security agreement, as defined in Section 9105 of the Commercial Code, the debtor has the right to sell the property covered thereby and is to account to the secured party for, and pay to the secured party the indebtedness secured by the security agreement from, the proceeds of the sale of any of the said property, and where such debtor, having sold the property covered by the security agreement and having received the proceeds of such sale, willfully and wrongfully, *and with the intent to defraud,* fails to pay to the secured party the amounts due under the security agreement, or the proceeds of the sale, whichever is the lesser amount, and appropriates such money to his own use, said debtor shall be guilty of embezzlement and shall be punishable as provided in Section 514.

Cal.Penal Code § 504b (emphasis added).

Assuming all other elements of embezzlement are met under § 504b, Transamerica's contention fails because the

bankruptcy court found that at all times the debtors intended to benefit the corporation by securing financing so that the company could pay all its debts. Section 504b requires Transamerica to prove as an element of embezzlement the intent to defraud. As discussed above, the bankruptcy courts' finding that at all times the debtors acted with the intent to benefit the corporation was supported by the record. This finding negates any contention that the debtors intended to defraud Transamerica when they diverted the proceeds in violation of the security agreement.

## CONCLUSION

The judgment of the bankruptcy court is affirmed.