In re Alexander V. SHERMAN,
Appellant,

v.

Igor POTAPOV, et al., Appellees.

Civil Action No. 08–11296–PBS.

United States District Court,
D. Massachusetts.

March 30, 2009.

**152**

Edward J. Fallman, Law Offices of Edward J. Fullman, Wakefield, MA, for Appellees.

Evan M. Fray–Witzer, Law Office of Evan Fray–Witzer, Boston, MA, Timothy M. Mauser, Mauser & Mauser, Boston, MA, for Appellant.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

Debtor-appellant Alexander Sherman appeals the final order of the bankruptcy court granting judgment in favor of the creditors-appellees Igor Potapov and B.A. Makden Corporation (collectively "Potapov"). The issue on appeal is whether the bankruptcy court properly held that an arbitration award was exempt from discharge as an embezzlement under 11 U.S.C. § 523(a)(4). After oral argument, this Court *AFFIRMS* the order of the bankruptcy court.

### FACTUAL BACKGROUND

#### 1. *The Loss*

In late 1998, Igor Potapov, Alan Davidson, Alexander Sherman, Irina Dunn and Boris Gleyzer formed Global Financial Group, Inc. ("Global"). (Hr'g Tr. vol. 2, 218, July 14, 2008.) Each held an equal twenty percent interest in Global. (Hr'g Tr. vol. 1, 58–59, July 14, 2008.) In 1999, Global purchased a broker-dealer, Whitehorne & Co., Ltd. ("Whitehorne"). (*Id.* at 86–91.) Potapov held investment accounts with Whitehorne in his name and for B.A. Makden Corp. ("Makden"), a corporation Potapov's friend from Russia had started for the purpose of stock trading and investing in the United States. (*Id.* at 21–22.) The Potapov and Makden accounts were non-discretionary accounts and no one at Whitehorne, including Sherman, had the authority to make any trades on the accounts without Potapov's prior approval. (*Id.* at 24.)

In mid-October 1999, Potapov left Massachusetts for a trip to Russia, returning two months later in December. (*Id.* at 30.) During that period, Whitehorne faced a crisis when three client margin accounts went negative and the clients failed to meet the margin calls. (Hr'g Tr. vol. 2, 177–80, 194–97, 212.) Essentially, the accounts all held short positions in technology stocks at a time when technology stocks were increasing in value. (*Id.* at 165–66.) The accounts were named Duhon, Anselm, and Coero. (*Id.* at 194–98.) Duhon and Anselm were Sherman's friends from Russia. Coero was a company owned by Duhon and another Russian friend. (*Id.* at 188–89.)

Under the protocols of Fiserv, Whitehorne's clearing house, if Whitehorne's customers failed to pay their margin calls, the accounts would be liquidated. (Hr'g

Tr. vol. 1, 26–27.) If the customers' accounts did not have sufficient value to cover the deficiencies, Fiserv could require Whitehorne and its agents to cover them. (*Id.*) If Whitehorne did not have sufficient capital to satisfy the losses, Fiserv could shut down Whitehorne's business operations and hold Whitehorne's agents, including Sherman, Dunn and Davidson, personally responsible for satisfying the deficiencies. (*Id.*)

Sherman instructed Dunn to transfer the negative positions out of the three accounts and into the Potapov and Makden accounts, using those accounts to absorb the losses and satisfy the deficiencies. (*Id.* at 139–41.) Dunn transferred numerous margin calls and shorted stocks from the three accounts into the Potapov and Makden accounts, leading to losses of $983,000. (*Id.* at 43–53.)

Sherman was aware of the margin calls and was directly involved in the decision to transfer the losses and the negative positions. (*Id.* at 108.) Although other customers also lost substantial amounts as a result of the firm's poor trading performance, only Sherman's friends' accounts had their negative positions transferred to the Potapov and Makden accounts. (*Id.* at 41–42.)

After learning of the transfers, Potapov kept his accounts open while the parties considered possibilities for reimbursing him. (*Id.* at 75–79, 81–82.) Sherman continued to work for Whitehorne for more than six months without compensation before Whitehorne was forced to shut down. (Hr'g Tr. vol. 2, 267–68.) Potapov has never been compensated for his losses. (Hr'g Tr. vol. 1, 75–79, 81–82.)

### 2. *The Arbitration Award*

Pursuant to written customer agreements with Dunn, Sherman and Davidson, Potapov brought an arbitration claim against the three before the National Association of Securities Dealers ("NASD"), alleging fraud, negligence, breach of contract, breach of fiduciary duty, and conversion. (Memorandum and Order at 2, *In re Dunn*, No. 06–cv–10630–PBS (D.Mass. Feb. 27, 2007) ("Mem. and Order").) Potapov asserted that the trio had converted or misappropriated the funds in the Whitehorne accounts. (*Id.*) In their defense, the three argued that Potapov had legally authorized the transactions. (*Id.*) If Potapov had done so, his claim would have failed as a matter of law. (*Id.*)

An adversarial hearing before a panel of arbitrators was held. (*Id.*) The panel heard testimony from thirteen witnesses over the course of eleven days and received one hundred and forty-seven exhibits as evidence. (*Id.*) On December 10, 2004, the panel issued an arbitration award in favor of Potapov against Sherman, Dunn and Davidson jointly and severally in the amount of $983,000. (*Id.* at 2–3.) The panel declined to award treble damages. (*Id.* at 3.)

The seven page arbitration award decision did not set forth any specific findings of fact, nor did it discuss the actions of each individual appellant. (*Id.*) Instead, the arbitrators, in articulating a "full and final resolution of the issues submitted for determination," merely outlined the procedural history of the arbitration and held that the appellants were jointly and severally liable to the appellees in the amount of $983,000. (*Id.*) No transcript from the arbitration hearing is part of this record. (*Id.*)

### 3. *The Bankruptcy*

Sherman, Dunn and Davidson individually filed Chapter 7 Bankruptcy Petitions in 2005 seeking to discharge the $983,000 NASD award in favor of the appellees.

(*Id.*) Potapov filed separate complaints in each of the bankruptcy cases to challenge the dischargeability of the NASD award. (*Id.*) Thereafter, Potapov filed a motion to consolidate all three adversary proceedings, which was allowed by the bankruptcy court. (*Id.*)

Subsequently, Potapov moved for summary judgment, claiming that the NASD award was not dischargeable, because the debt arose from the intentional conversion of his accounts, and this constituted "embezzlement or larceny" under 11 U.S.C. § 523(a)(4). (*Id.* at 3–4.) Appellees also asserted that the award was a non-dischargeable debt pursuant to 11 U.S.C. § 523(a)(6), because the actions of the debtors constituted a "willful and malicious" injury to the appellees. (*Id.* at 4.)

In response, the debtors argued that Potapov had legally authorized the transactions. (*Id.*) If Potapov had done so, the appellees' attempt to render the NASD award non-dischargeable would likely fail. (*Id.*) The debtors' had raised a similar argument during the NASD arbitration. (*Id.*) There, the arbitrators considered the question of whether Potapov had authorized the transactions, but ultimately awarded compensation to the appellees. (*Id.*) The appellees argued that the debtors should be precluded from relitigating the issue of whether Potapov had authorized the transactions. (*Id.*)

On January 25, 2006, a hearing was held in the bankruptcy court on the summary judgment motion. (*Id.*) The bankruptcy court orally entered an order allowing the motion, stating:

> The summary judgment standard is the usual which I need not repeat for all of you under rule 56. You get to the question of res judicata, and I think *Printy* is still very good law when it comes to the question of res judicata of an arbitration decision, not only as to counterclaims, but as to anything which was or could have been raised in the arbitration ... I think there's no question, but that for which it stands, the arbitrators' award is res judicata. . . .
>
> So I can't find under the what I've always called the "no sane man summary judgment rule of this Circuit" that (a)(6), 523(a)(6), is comp—a decision in favor of the plaintiffs under 523(a)(6) is compelled by what I have before me, and I will find for the defendants as to that. But as to (a)(4), which is embezzlement ... I think that the complaint and the money judgment granted demonstrate all of the elements of 523(a)(4), and I'm prepared to grant the motion for summary judgment as to each of the defendants on the basis of 523(a)(4).
>
> Now my judgment is that these debts are not dischargeable. . . .
>
> And so based upon what I have said, I will grant the motion for summary judgment in favor of the plaintiffs against each of the defendants under 11 USC 523(a)(4), and an order to that effect will enter today.

(*Id.* at 4–5.) Thus the bankruptcy court determined that the arbitrators had decided that Potapov had not authorized the transactions. (*Id.* at 5.) Giving this determination preclusive effect, the court found that there was sufficient evidence of embezzlement by all of the debtors to render the NASD award non-dischargeable under § 523(a)(4). (*Id.*)

Debtors filed a timely notice of appeal. (*Id.*)

### 4. *The First Appeal*

On appeal, I reversed the order of the bankruptcy court holding:

> Potapov argues that the issue of authorization was determined by a valid and binding final judgment. This Court

agrees that it is reasonable to infer from the arbitration pleadings and subsequent judgment that the arbitration panel decided, as a bare matter of fact, that Potapov did not authorize the disputed transactions. If the NASD panel had found that he did authorize the transactions, then the appellees could not have recovered under any theory presented in the NASD complaint. In fact, during oral argument, counsel for the appellants conceded that it was proper to infer from the NASD award that there was a finding that the transfers were not authorized. Moreover, the parties fully litigated the question of whether Potapov authorized the transactions in question: even from the scant NASD record, it is obvious that the hearing was thorough, that the debtors were represented by counsel, and that the debtors pressed the issue of whether Potapov authorized the transactions as a primary defense to the appellees' claims.

Under the first prong of the collateral estoppel test—whether the issue sought to be precluded is the same as that involved in the prior action—the appellees' preclusion argument falls short. Although the panel necessarily found that Potapov did not authorize the transactions and that a conversion occurred, there was no explicit or implicit finding that the debtors, either collectively or individually, acted with a sufficient mental state to constitute "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" under § 523(a)(4) or "for willful and malicious injury" under § 523(a)(6). As the debtors correctly point out, additional facts concerning the mental state of any of the three appellants is necessary to render the debt non-dischargeable under either of these sections. It is certainly conceivable that Potapov did not authorize the transactions but that the debtors did not act with the requisite fraudulent mental state to constitute fraud or malicious conduct. For instance, perhaps one of the debtors was mistaken in good faith about Potapov's instructions.

Moreover, the scant record from the arbitration does not specify how each individual appellant acted in relation to the conversion. It is possible that only one particular debtor converted the appellees' assets or that only one debtor possessed the requisite fraudulent mental state. Put another way, it is impossible to divine from the record whether one or more of the individual appellants acted to embezzle, steal, or maliciously injure the appellees at the time of the transactions.

Therefore, from this record, this Court cannot conclude that the appellants are precluded from litigating the factual issues of § 523(a). In other words, the issue sought to be precluded by the appellees based on this record— namely, any fact allowing a court to find § 523(a) satisfied—is materially different from the issue resolved by the arbitration panel—whether Potapov authorized the transaction. Summary judgment was improper.

(*Id.* at 13–15 (internal citations omitted).)

### 5. *The Adversary Hearing on Remand*

Following the remand order, the bankruptcy court held a trial on the issue of whether the NASD award was nondischargeable as to Sherman.[1] At trial, the

---

1. The two other debtors in the consolidated adversary proceedings, Irina Dunn and Alan Davidson, settled their cases with the Plain- tiffs prior to trial, leaving only the Sherman case to be tried before the bankruptcy court. The Dunn and Davidson settlements were ap-

bankruptcy court heard the testimony of five witnesses and over one hundred and twenty exhibits were submitted as evidence by the parties. (Hr'g Tr. vol. 1; Hr'g Tr. vol. 2.)

At the close of all the evidence, the bankruptcy court issued its findings and held that the NASD award was a nondischargeable debt as an embezzlement pursuant to § 523(a)(4). (Hr'g Tr. vol. 2, 331–37.) In accordance with this Court's remand order, the bankruptcy court noted that

> So we start by looking at—I said "embezzlement" because it's easier—knowing that we find that there was no authorization to make the transfers to the Potapov account, and I have to look beyond that to motivation. . . .
>
> So what I have to find is that the debtor's appropriation of the property was for the debtor's benefit, and the appropriation occurred with fraudulent intent of deceit.
>
> Now we come to the hard stuff. The question is, what did Mr. Sherman know, and what did he do about it, and when did he know about it? And we have diametrically opposed versions of Mr. Sherman's knowledge.
>
> The plaintiff's witness admitted Mr. Mordukhaev testified that he had overheard discussions in which Mr. Sherman was a party . . . discussing these transfers to be made.
>
> . . . .
>
> . . . . [Ms. Dunn's testimony] makes me believe . . . that at the time that the problem was there, it was exposed to all of them, all of them, the principals of the corporation, and I asked her if they knew how she was planning to solve it by making these transfers, and she said,

> "Yes." She said it was the only way to save the company, and she said, and if I can find the quote—(pause)—she told everyone of the problems, she told them all what she intended to do to protect the company, and she said it wasn't proper how it was done, she's now says, and I found her testimony to be creditable and credible. She really tried to protect Mr. Sherman, but, as I say, she just couldn't make it because the facts don't supports what she tried to do to save him.
>
> Now I come to Mr. Sherman's testimony, and that's easy, that's just the opposite. "No, I didn't know anything until December." Now we're down to the hard job for a trial judge, and that's credibility of witnesses. Quite frankly, I don't believe Mr. Sherman. He dissembled, he evaded, his body language was such that even before he took the stand, I didn't have much confidence in what he was going to say as he sat there at counsel table. And then as I listened to his testimony, he—responded to questions one of two ways: either flat denials or effectively non-responsive answers. . . .
>
> . . . .
>
> Put it all together, I think that's the better—the better case, and I find that Mr. Sherman knew what was going on before it went on, and that he is guilty of embezzlement. . . .

(*Id.* at 333–36.) The bankruptcy court thus found that Sherman had the requisite mental state for embezzlement and therefore his debt to Potapov was nondischargeable. (*Id.* at 331–37.) On July 15, 2008, the bankruptcy court entered a final judgment and order in accordance with its findings and rulings in favor of the Plain-

proved by the bankruptcy court and the Sherman case was severed from the consolidated cases. *See* Amended Order, *In re Sherman*, No. 05–01076 (Bankr.D.Mass. July 15, 2008).

tiffs. Thereafter, Sherman filed this second appeal.

## DISCUSSION

### 1. *Applicable Standard of Review*

■ "A district court reviews a bankruptcy court's judgment in the same manner in which [a Court of Appeals] review[s] lower court proceedings." *In re DN Assocs.*, 3 F.3d 512, 515 (1st Cir.1993). Questions of law are reviewed de novo. *Id.* Findings of fact are reviewed for clear error. *Id.*

### 2. *Nondischargeability of Debts*

With some exceptions, debtors who file for bankruptcy under Chapter 7 are able to discharge their debts. However, 11 U.S.C. § 523 articulates certain exceptions: "a discharge under section 727 . . . of this title does not discharge an individual from any debt—. . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523.

■ Embezzlement within the meaning of § 523(a)(4) has been defined as the fraudulent appropriation of property by a person to whom it has been entrusted or into whose hands it has lawfully come. *In re Brady*, 101 F.3d 1165, 1172–73 (6th Cir.1996). To establish embezzlement, the creditor must prove three elements: "(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud." *In re Littleton*, 942 F.2d 551, 555 (9th Cir.1991). Because of the preclusive effect of the arbitration, the only element in question on this appeal is whether or not Mr. Sherman had the requisite intent to defraud. The notion of "fraudulent conversion" is "at the heart of embezzlement," and it "essentially refers to, say, a bank teller, trustee, or guardian using money entrusted to him by another person for his own purposes or benefit and in a way that he knows the 'entruster' did not intend or authorize." *United States v. Young*, 955 F.2d 99, 102 (1st Cir.1992). In other words, the touchstone of embezzlement is fraudulent conversion. *Id.*

■ Exceptions from discharge are to be narrowly construed in favor of the debtor and the burden of proof is on the creditor to prove all the elements of the embezzlement by a preponderance of the evidence. *See In re Spigel*, 260 F.3d 27, 32 (1st Cir.2001); *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). If the debtor procured Potapov's funds through embezzlement, then he cannot discharge his debts through bankruptcy. *See In re Brady*, 101 F.3d at 1172–73 (discussing nondischargeability under § 523(a)(4)).

Appellant's main argument is that because the transfers were made in an attempt to save Whitehorne, he lacked the necessary fraudulent intent. In some cases, courts have found that a debtor did not have the necessary fraudulent intent when the debtor used money in violation of contractual obligations with the intent to keep his company afloat so that it could eventually pay all its debts. For example, in *In re Littleton*, a case on which appellant relies heavily, debtors entered into a security agreement to finance their inventory. 942 F.2d at 552. Under the agreement, the debtors were obligated to pay the creditor the price of the financed inventory as sales occurred. *Id.* at 553. At some point, the debtors failed to make the necessary payments in an effort to keep the company viable. *Id.* at 556. The Ninth Circuit affirmed the lower court's holding that the fact that "at all times the debtors acted with the intent to benefit the corporation by securing financing so that

the company could pay all its debts ... negates any contention that the debtors intended to defraud [the creditor]." *Id.* at 556 (quoting *In re Littleton*, 106 B.R. 632, 639 (9th Cir. BAP 1989)).

Likewise, in *In re Fox*, 370 B.R. 104 (6th Cir. BAP 2007) a lender brought a proceeding against a debtor, a debt collection agency, because the debtor failed to deposit collected debts in a separate account. *Id.* at 109–11. Because the debtor used the misappropriated funds to keep his company afloat, and in turn benefit the creditor by continuing to collect on the creditor's accounts, the court held that the debtor's actions supported the conclusion that he lacked the requisite fraudulent intent. *Id.* at 118. *See also In re Hartman*, 254 B.R. 669, 674 (Bankr.E.D.Pa.2000) ("Debtor has adequately shown that almost all of the proceeds she received from inventory, equipment and fixtures were reinvested in the business for traditional business purposes and used to pay normal business debts.... We find this to be sufficient evidence that Debtor did not harbor the requisite fraudulent intent to embezzle [the creditor's] collateral for her own personal gain"); *Nat'l Tour Ass'n, Inc. v. Rodriguez*, 221 B.R. 1012, 1015–17 (Bankr. M.D.Fla.1998) (holding that the debtor did not have the requisite fraudulent intent where the debtor's actions were an attempt to save the business and debtor was not personally enriched); *In re Tomlinson*, 220 B.R. 134, 136 (Bankr.M.D.Fla. 1998) (holding that because the defendant "merely sought to maintain the corporation as an ongoing enterprise" he did not act with the necessary fraudulent intent).

However, this is no ironclad rule. Another line of cases runs in the opposite direction, holding that even where the debtor's "intent was to repay [the debtor] from future profits from the continued operation of the [business] it is no defense to the offense of embezzlement." *In re Hoffman*, 70 B.R. 155, 163–64 (Bankr.W.D.Ark. 1986). In *In re Hoffman*, a farmer owed significant amounts to a bank, which held liens on his crops and farm equipment. *Id.* at 158. In financial trouble, the farmer sold crops and equipment, failing to pay the bank the proceeds as required. *Id.* "The unremitted proceeds were used ... to operate the farming business, to service other debts of the farm or to purchase new equipment. There was no evidence that any of the unremitted money was appropriated for purposes other than legitimate farming expenses." *Id.* The debtor testified that he believed that "things would somehow work out, and that [the bank] would be paid along with everyone else." *Id.* at 159. Nevertheless, given the circumstances, the court held that the facts made out a prima facie case that the debt was nondischargeable because it arose out of embezzlement. *Id.* at 163; *see also Matter of Shuler*, 21 B.R. 643, 644 (Bankr.D.Idaho 1982) ("The fact that the intent is to deprive the rightful owner of the funds only temporarily and not permanently, as is often the situation in cases such as [this] ... does not eliminate the element of intent."); *In re Bevilacqua*, 53 B.R. 331, 334 (Bankr.S.D.N.Y.1985) (where debtor took funds "either for his own personal use or for that of his corporation" "[e]ven if [the debtor] intended to use the funds only temporarily, [the creditor] was deprived of his property and the resulting conversion constitutes embezzlement for purposes of section 523(a)(4)"). Together, these lines of cases indicate that any number of factors may be considered in deciding whether there are "circumstances indicating fraud" and determining intent.

Here, even if Sherman truly was trying to save the company, that fact is not dispositive in the circumstances of this case, where Sherman shifted the financial

burden of a bad trading strategy from favored clients, who were his friends, to an absent client. Courts "may infer intent from the debtor's actions and surrounding circumstances." *In re Romano,* 353 B.R. 738, 766 (Bankr.D.Mass.2006) (quoting *In re McKnew,* 270 B.R. 593, 632 (Bankr. E.D.Va.2001)). Here, the transfer was not disclosed and there was no evidence that Sherman reasonably believed Potapov would approve it. Indeed, there is evidence that Sherman initially refused to meet with Potapov or take his phone calls after the transfer and, when finally confronted, lied about the circumstances of the transfer and threatened that Potapov would get nothing if he went to the authorities. (Hr'g Tr. vol. 1, 36–42.) Further, "a determination concerning fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor." *Palmacci v. Umpierrez,* 121 F.3d 781, 785 (1st Cir.1997) (quoting *In re Burgess,* 955 F.2d 134, 137 (1st Cir.1992)). At trial, the bankruptcy court found Sherman's testimony non-responsive, evasive, and frankly unbelievable. (Hr'g Tr. vol. 2, 335.) In essence, Sherman was robbing Peter to pay Paul. While it may well be true that Sherman hoped to eventually save the company and repay Potapov, the bankruptcy court had ample evidence that there were "circumstances indicating fraud" and that Sherman had the necessary fraudulent intent when he shifted the risk from one client to another. The remaining challenges are without merit.

### ORDER

The order of the bankruptcy court is **AFFIRMED.**